717 F.2d 1481
 14 Fed. R. Evid. Serv. 26
 UNITED STATES of America, Appellee,
v.
Ronald Doyle HINES, Appellant.
UNITED STATES of America, Appellee,
v.
Gary J. PEED, Appellant.
UNITED STATES of America, Appellee,
v.
Teresa ELEAZAR, Appellant.
UNITED STATES of America, Appellee,
v.
James Maurice JACKSON, Appellant.
UNITED STATES of America, Appellee,
v.
James C. CODDINGTON, Appellant.
UNITED STATES of America, Appellee,
v.
Jeffrey Craig BUMGARDNER, Appellant.
 Nos. 82-5274(L), 82-5275 to 82-5278 and 82-5286.
 United States Court of Appeals,
Fourth Circuit.
 Argued July 14, 1983.
Decided Sept. 9, 1983.
 
 William J. Sheppard, Jacksonville, Fla. (Elizabeth L. White, Jacksonville, Fla., on brief), and Gary S. Lawrence, Raleigh, N.C. (Steven D. Kupferberg, Baltimore, Md., Hugh Clifton Talton, Jr., Smithfield, N.C., Christine Witcover Dean, Raleigh, N.C., Edwin C. Walker, on brief), for appellants.
 William E. Martin, Asst. U.S. Atty., Raleigh, N.C. (Samuel T. Currin, U.S. Atty., Wallace W. Dixon, Asst. U.S. Atty., Raleigh, N.C., James G. Lindsay, U.S. Dept. of Justice, Washington, D.C., on brief), for appellee.
 Before PHILLIPS, SPROUSE and ERVIN, Circuit Judges.
 ERVIN, Circuit Judge:
 
 
 1
 Ronald Doyle Hines, Gary J. Peed, Teresa Eleazar, James "Bubba" Jackson, James Coddington and Jeffrey Bumgardner appeal from the United States District Court for the Eastern District of North Carolina wherein they were tried for conspiracy to possess with intent to manufacture and distribute cocaine in violation of 21 U.S.C. Sec. 841(a)(1) and of using a communication facility to facilitate the cocaine conspiracy in violation of 21 U.S.C. Sec. 843(b).
 
 
 2
 Viewing the evidence in the light most favorable to the government, the prosecution's case at trial established the existence of a two-tier conspiracy. The first tier was headquartered in Apex, North Carolina, under the command of James "Jacques" Provost. Jacques had two investors or partners in the first tier, Gary Peed of Virginia and James Coddington of Orlando, Florida. The first tier had three employees who acted as drug couriers, Jacques's son Darryl Provost, Peter Stisser, and Bubba Jackson. Darryl and Peter turned government witnesses and provided the crucial trial testimony against their co-conspirators.
 
 
 3
 The second tier was the smaller and local operation in Jacksonville, Florida, including Ronald Hines, Jeffrey Bumgardner and Teresa Eleazar. Contacts between the two tiers were made by Bubba Jackson, Eleazar's brother.
 
 
 4
 The jury found appellants guilty of both counts, except that Eleazar was acquitted on the telephone facilitation count. Peed, Coddington, and Jackson were sentenced to four years imprisonment plus five years probation. Hines, Eleazar and Bumgardner received six months imprisonment with five years probation.
 
 
 5
 On appeal, the appellants claim nine reversible errors in their trial. Finding no merit to any of the challenges, we affirm.
 
 I.
 
 6
 In September, 1980, a double murder occurred in Jacksonville Beach, Florida. In July, 1981, two Jacksonville Beach police investigators, Officers Dorn and Maxwell, learned that "Bones" Merrill might have acted as a lookout during the murders. Bones was questioned and agreed to act as an informant in the investigation of Jacques Provost, who was suspected of having ordered the murders to avenge a delinquent drug debt and is now deceased.
 
 
 7
 Beginning on July 27, 1981, Bones made seven or eight consensually recorded phone calls from pay telephones in Jacksonville Beach to Jacques's home in St. Johns County, Florida, which was outside Dorn's and Maxwell's bailiwick. Since most of the information obtained concerned Jacques's ongoing drug operations, on July 29, 1981, the information was turned over to Agent Alford of the Florida Department of Law Enforcement, an agency with statewide jurisdiction.
 
 
 8
 On August 29, Alford obtained an electronic surveillance warrant for Jacques's St. Johns County home. Alford eventually learned that Jacques had moved the center of his drug operations to a house in Apex, North Carolina.
 
 
 9
 Alford passed the information on to Agent Johannesen of the Federal Drug Enforcement Agency ("DEA") in Raleigh, North Carolina. Johannesen used the information to obtain a wiretap on Jacques's telephone in Apex from September 29, 1981 to October 14, 1981. Information developed from the wiretap led to the indictments of the appellants.
 
 
 10
 Appellants complain that the Apex wiretap evidence should have been suppressed because it was the fruit of the Florida consensual monitoring and electronic surveillance, which appellants contend were illegal. See Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). The consensual monitoring allegedly was illegal because officers Maxwell and Dorn were operating outside their jurisdiction. Appellants challenge the electronic surveillance on the grounds that it was issued based on an affidavit that contained intentional, reckless, and material misrepresentations.
 
 
 11
 Appellants contend that Maxwell and Dorn, Jacksonville Beach police officers, acted outside their jurisdiction by consensually monitoring Bones's nine pre-August 6, 1981 calls to Jacques's St. Johns County home. Maxwell and Dorn were not deputized in St. Johns County until August 6, 1981. Appellants rely on Wilson v. Florida, 403 So.2d 982 (Fla.1980), in which Lake City, Florida, police officers conducted an investigation into Wilson's possession of drugs outside the municipal limits of Lake City. In conducting the investigation, the officers employed an electronic listening device that was hidden on an informant who purchased drugs from Wilson outside Lake City. The court held that fruits of the electronic surveillance could not form the basis for the issuance of a search warrant because the officers were without authority to conduct the investigation.
 
 
 12
 Wilson, however, is distinguishable from the present case. In Wilson, the investigation was into the possession of contraband outside Lake City. The Wilson court indicated, 403 So.2d at 984, that it would have reached a different result had the investigation been into Wilson's illegal acts within Lake City: "a municipal police officer ... may conduct investigations outside the city limits ... where the subject matter of the investigation originated inside the city limits, State v. Chapman, 376 So.2d 262 (Fla. 3d DCA 1979); Parker v. State, 362 So.2d 1033 (Fla. 1st DCA 1978)." Here, the subject matter of the investigations, the 1980 double murder in Jacksonville Beach, did originate within the city limits.
 
 
 13
 Of the nine pre-August 6 telephone calls, the first seven or eight were made from Jacksonville Beach, so Maxwell and Dorn were within their jurisdiction. Furthermore, since Dorn and Maxwell brought agent Alford, who had statewide jurisdiction, into the investigation on July 29, the monitoring of Bones's calls from Jacksonville were under the direction of Alford; i.e. the officers acted "under color of law," 28 U.S.C. Sec. 2511(2)(c), or "under the direction of a law enforcement officer," Fla.Stat. 934.03(2)(c).[1] Thus, the pre-August 6 calls comply with both the federal and state consensual monitoring statutes.[2]
 
 
 14
 Appellants contend that the application of agent Alford for the Florida wiretap contained material misrepresentations which were intentionally and recklessly made and which were necessary to the finding of probable cause and, thus, that the Florida wiretap evidence was illegally seized under Franks v. Delaware, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). The alleged misrepresentations are that (1) Bones was a collector of drug debts for Jacques, (2) Bones revealed that Jacques imported drugs and was putting together an airplane scheme involving 15 kilograms of cocaine, (3) Jacques told Bones that he had some "heavy business", wanted Bones to work for him, and was meeting with some business associates to plan a large transaction, (4) Bones and Jacques discussed the details of a trip down south, (5) Jacques told Bones that he was waiting for a phone call and would know more after he received it, and (6) Darryl Provost told Bones that there was a change of plans and Bubba Jackson was going up north to collect some money.
 
 
 15
 Our review of the record, however, indicates that the alleged misrepresentations either did not occur or were immaterial: (1) during an August 3, 1981 interview of Bones by Maxwell and Dorn, Bones indicated that he collected drug debts in New York and Atlanta for Jacques; (2) during the August 3 interview, Bones and the officers discussed the plane deal; (3) while Jacques did not say he had some "heavy" business, he did say "I got two business people with me" who are "real business" people and "ah man, if you could see all the [stuff] that Mike and Bang put me in its unbelievable," and arranged for Bones to come to Jacques's home to discuss work; (4) Jacques told Bones on July 30, 1981 that "I was thinking of sending you with [Darryl] down south" and "I don't know what time you guys be leaving, but I would around twelve"; (5) although Jacques did not say he was waiting on a phone call, he did tell Bones that for the moment he had nothing for Bones to do, but that he was "waiting for somebody to be here" so Bones should call back "around supper,"; and (6) Bones's telephone call of August 1 and August 5 interview, when read together, indicate that Jackson had traveled north and Jacques was waiting for him to bring back some money. Not only are there no material misrepresentations, but there is no indication that the minor inaccuracies were intentional or reckless. Thus, the Florida wiretap evidence was not illegally seized under Franks.
 
 II.
 
 16
 The Interstate Agreement on Detainers Act ("IAD") provides that if trial is not held within 120 days of the date a prisoner arrives in a receiving state, the charges are to be dismissed with prejudice. 18 U.S.C. Appx. Arts. IV(c), V(c). The running of the 120-day limitation, however, may be tolled by the district court "for good cause shown in open court, the prisoner or his counsel being present." Id.
 
 
 17
 The government brought Bubba Jackson to North Carolina for trial from Florida, where he was in custody, by detainer. The 120-day limitation began running on April 13, 1982, the date Jackson arrived in North Carolina. See United States v. Bryant, 612 F.2d 806, 810-11 n. 7 (4th Cir.), cert. denied, 446 U.S. 920, 100 S.Ct. 1855, 64 L.Ed.2d 274 (1980). The trial commenced on August 24, 1982, 133 days later. The parties dispute whether the running of the 120-day limitation period was tolled for at least 13 days.
 
 
 18
 In United States v. Odom, 674 F.2d 228, 230 (4th Cir.), cert. denied, 457 U.S. 1125, 102 S.Ct. 2946, 73 L.Ed.2d 1341 (1983), this court held that a defendant waives the 120-day limitation by requesting to be treated in a manner inconsistent therewith. The Odom court also held that the periods excluded under the Speedy Trial Act, see 18 U.S.C. Sec. 3161(h)(1)(F) (e.g., period from filing to disposition of pretrial motion) likewise should be excluded under the IAD. Thus, the government seeks to exclude all days from the filing of pretrial motions to the prompt disposition of those motions, since on April 26 Jackson moved the court to allow him to adopt the motions of his co-defendants. Hearings alone on these pretrial motions took 16 days (May 20-31, June 11-12, June 21-22). Indeed, in rejecting Jackson's motion for dismissal under the IAD, the district court found that Jackson's joining in the motion to suppress the wiretap evidence, without more, amounted to a waiver of the 120-day limitation.
 
 
 19
 Of critical importance in the instant situation are defendant Jackson's motion to suppress evidence seized as a result of various electronic surveillances. Had the motion to suppress been allowed, it is doubtful that the government could have proceeded to trial since its case was based almost entirely upon this evidence. At least forty-seven days were required by the Magistrate to consider fully and make a recommendation concerning these motions to suppress. Since the trial commenced thirteen days after the running of the 120-day limitation, the 47-day delay caused by defendant Jackson's motions to suppress provides sufficient justification for the denial of defendant Jackson's motion to dismiss based upon the Interstate Agreement on Detainers.
 
 
 20
 The government also lists several continuances (i.e., requests to be treated inconsistently with the IAD) granted at Jackson's request: (1) at the request of Jackson's attorney, a pretrial hearing was delayed three days from June 7 to June 10; (2) the June 10-12 hearings were continued nine days until June 21 at the request of all attorneys, including Jackson's; (3) at Jackson's attorney's request, defense counsel were given ten days, from June 22 until July 2 to file additional memoranda; and (4) Jackson's attorney, as well as other defense counsel, indicated that the clerk's suggested trial date of July 19 was not satisfactory, and the trial eventually was set for August 16.
 
 
 21
 Jackson attacks the government's assertion that he sought continuances. He cannot, however, rebut the government's claim that he sought an additional ten days to file memoranda or that he indicated that a July 19 trial date was unsatisfactory. Furthermore, even without considering the continuances, Jackson must be deemed to have waived the 120-day limitation by joining in the co-defendants' motions, especially the motion to suppress the wiretap evidence.
 
 
 22
 It is not surprising that Jackson was held beyond 120 days given defense counsel's extensive pretrial motions. Jackson joined in those motions, which took a substantial amount of time to resolve, and then surprised the district court by moving for a dismissal under the IAD on the first day of trial. Jackson sought to benefit from the pretrial motions which necessarily resulted in delays, and cannot now claim that he is aggrieved under the IAD by those delays.
 
 III.
 
 23
 Appellants argue that the indictment did not charge possession of a controlled substance listed under 21 U.S.C. Sec. 812 Sched. II, and that the government failed to prove possession of a Sec. 812 Sched. II controlled substance. The arguments are meritless.
 
 
 24
 The indictments charge a conspiracy to possess with intent to distribute "a schedule II narcotic controlled substance, to-wit: cocaine, in violation of the provisions of 21 United States Code, Sec. 841(a)(1)." Appellants note that possession of some cocaine isomers is legal and conclude that the use of the single word "cocaine" makes the indictment insufficient. The argument ignores the placing of "cocaine" in apposition to the phrase "a schedule II controlled substance." The indictment thus clearly contains a sufficient description of the "controlled substance" element of the offense.
 
 
 25
 Appellants claim that the government failed to prove that the cocaine here was the illegal kind of cocaine that is a controlled substance under 21 U.S.C. Sec. 812 Sched. II. Appellants point out that the government's expert testified that the seized substance was "cocaine" but that it was not a "narcotic." Since the statutory definitions of the narcotic cocaine and controlled substance cocaine are similar, see 21 U.S.C. Secs. 802(16), 812 Sched. II(a)(4), appellants conclude that the evidence was consistent with a conspiracy to distribute the legal kind of cocaine.
 
 
 26
 The government's expert, however, was unequivocal that the seized cocaine was a controlled substance within the meaning of 21 U.S.C. Sec. 812 Sched. II. Her statement that in chemical terms cocaine is "a stimulant or basic euphoriant," but not a "narcotic" did not affect her conclusion that the seized cocaine was a controlled substance within the meaning of 21 U.S.C. Sec. 812 Sched. II. Furthermore, she stated only that cocaine chemically is not a narcotic, not that cocaine is not a narcotic as defined in 21 U.S.C. Sec. 802(16). Moreover, the offense charged, violation of 21 U.S.C. Sec. 841(a), requires proof of "possess[ion] with intent to manufacture, distribute, or dispense, a [Sec. 812 Sched. II] controlled substance." Whether cocaine is a narcotic within the meaning of 21 U.S.C. Sec. 802(16) was irrelevant to the determination of guilt or innocence.[3]
 
 IV.
 
 27
 Out-of-court statements by co-conspirators made "during the course of and in furtherance of the conspiracy" are not hearsay and are admissible. Fed.R.Evid. 801(d)(2)(E). Their admissibility turns on "the existence of substantial evidence of the conspiracy other than the statement itself." United States v. Dockins, 659 F.2d 15, 16 (4th Cir.1981). Whether such evidence exists is a question for the trial judge. Fed.R.Evid. 104; United States v. Jones, 542 F.2d 186, 203 n. 33 (4th Cir.), cert. denied, 426 U.S. 922, 96 S.Ct. 2629, 49 L.Ed.2d 376 (1976).
 
 
 28
 Appellants, relying on the Fifth Circuit decision in United States v. James, 590 F.2d 575 (5th Cir.), cert. denied, 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979), argue that it was error for the trial court here not to hold a hearing to determine the existence of the conspiracy before any of the co-conspirator statements were admitted in the case-in-chief. This court, however, does not require the James hearing. Instead, a trial judge retains the option to admit conditionally the declarations of co-conspirators before the conspiracy has been independently established, subject to the subsequent fulfillment of that factual predicate. United States v. McCormick, 565 F.2d 286, 289 n. 5 (4th Cir.), cert. denied, 434 U.S. 1021, 98 S.Ct. 747, 54 L.Ed.2d 769 (1978). The district court safeguards the defendant's rights by being prepared either to declare a mistrial or to dismiss the case if the government fails to prove aliunde that a conspiracy existed. Here, that declaration was unwarranted since the existence of a conspiracy was proved by a preponderance of the independent evidence. Indeed, appellants do not challenge the district court's finding that there was sufficient independent evidence of the conspiracy among Coddington, Jackson, and Peed. Rather, they claim a lack of independent evidence that Eleazar, Bumgardner, and Hines were part of that conspiracy. Our review of the evidence, however, indicates otherwise. The recorded conversations of Bumgardner, Hines and Eleazar with Jackson, the go-between of this two-tiered conspiracy, are replete with references by them to their cocaine dealings. See Fed.R.Evid. 801(d)(2)(E). Although Eleazar made only two comments during those calls, one comment--"Ronnie got all that stuff"--apparently informed Jackson that a cocaine delivery had been accomplished and she admitted sending money, which other evidence indicated was in payment for drugs, under a false name to Jackson. This independent evidence was sufficient to establish their participation in the two-tier conspiracy.
 
 V.
 
 29
 During the course of the trial, evidence of appellants' bad acts other than the cocaine conspiracy was introduced: (1) Stisser testified that he delivered cocaine to Coddington on a date subsequent to the period of the conspiracy charged; (2) references were made to marijuana dealings before the inception of the cocaine conspiracy; (3) Darryl Provost and Stisser testified that they dealt in quaaludes with Jacques Provost; and (4) Eleazar testified that Jackson was a bond jumper. Appellants argue that they were unfairly prejudiced by the other acts evidence because (1) the consideration of such evidence was not limited to the defendants involved in the acts, thus allowing the government to prove guilt by association, and (2) the evidence was inadmissible under Fed.R.Evid. 404 as allowing the government to prove guilt by bad character.
 
 
 30
 While other bad acts evidence is not admissible to show the character of the accused, it is admissible to show motive, intent, absence of mistake, and the like. Fed.R.Evid. 404(b). Thus, the district court here instructed the jury:
 
 
 31
 [I]f you, the jury, should find beyond a reasonable doubt, from other evidence in the case, that the accused did the acts charged in this indictment, then the jury may consider evidence as to some other act of a similar or like nature, on the part of the accused, in determining the state of mind or intent, with which the accused did the act which is charged in the indictment. And where proof of an alleged similar act, done at some other time or place, is clear and conclusive, the jury may, but is not obligated to, draw the inference and find that in doing the act charged in this indictment, the accused acted wilfully and not because of mistake or accident or other innocent reason. (emphasis added).
 
 
 32
 Not only did that instruction limit the jury's consideration of the other acts evidence to proof of wilfulness or absence of mistake, but it also limited consideration to the particular accused who performed the other act.
 
 
 33
 Furthermore, the specific other acts evidence admitted satisfied Rule 404(b) and the probativeness-prejudice balancing requirement of Rule 403. Stisser testified that he delivered cocaine to Coddington in late October, several weeks after the conspiracy alleged in the indictment. Nevertheless, this court has held that "subsequent conduct may be highly probative of prior intent." United States v. Hadaway, 681 F.2d 214, 217 (4th Cir.1982). The probativeness is especially great here given the closeness in time--several weeks--of the similar acts.
 
 
 34
 Although the marijuana conspiracy counts were severed before trial on the grounds that "evidence concerning the marijuana conspiracy may very well be prejudicial to the defendants not charged in those counts," that does not automatically require a finding of unfair prejudice because of the limited references to marijuana dealings in the cocaine trial. Presumably, if the counts had not been severed, a significantly higher quantity of evidence concerning the marijuana conspiracy would have been introduced, thereby increasing the possibility of prejudice. Here, the limited references to marijuana dealings in order to show intent concerning the cocaine dealings were proper under Rule 404(b). See United States v. Brugman, 655 F.2d 540, 543-45 (4th Cir.1981) (evidence concerning marijuana and hashish dealings admissible under Rule 404(b) on charge of cocaine conspiracy). The same reasoning applies to the references to quaalude dealings.
 
 
 35
 While Eleazar's testimony about Jackson being a bond jumper was not admissible under Rule 404(b), the evidence was elicited by Eleazar's defense counsel, not the government, and immediately struck by the district court as inadmissible hearsay with the instruction to the jury to disregard it. We discern no reversible error in the district court's handling of the inadmissible testimony. See United States v. Johnson, 610 F.2d 194, 197 (4th Cir.), cert. denied, 446 U.S. 911, 100 S.Ct. 1840, 64 L.Ed.2d 264 (1980), ("[a]bsent ... misconduct on the part of the government counsel, the courts generally have discerned no reversible error where the trial court has acted promptly in sustaining an objection and advising the jury to disregard the testimony").
 
 VI.
 
 36
 The government bears the burden of proving the single conspiracy it charged in the indictment. On appeal, this court must determine whether the evidence, when viewed in the light most favorable to the government, Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), supports the jury's finding of a single conspiracy. If not, reversal is required only where proof of the multiple conspiracies prejudiced the defendants' substantial rights. United States v. Coward, 630 F.2d 229, 231 (4th Cir.), cert. denied, 456 U.S. 946, 102 S.Ct. 2014, 72 L.Ed.2d 470 (1982).
 
 
 37
 Appellants argue that their convictions were flawed because the government proved ten conspiracies instead of the single conspiracy charged. Appellants view the evidence as showing a wheel conspiracy with Peed, Coddington, and Jackson at the center and Hines, Eleazar, and Bumgardner as one of the spokes. Since the government did not show that Hines, Bumgardner, and Eleazar knew of the other spokes in the conspiracy, the three could not be considered members of the overall wheel conspiracy. Absent proof of such knowledge, the evidence shows numerous separate conspiracies (i.e., unrelated spokes). We cannot agree.
 
 
 38
 Viewing the evidence in the light most favorable to the government, a two-tiered conspiracy was shown. The first level included Peed, Coddington, and Jackson and the second included Bumgardner, Hines, and Eleazar. Jackson was the link between the two tiers. The first tier was the wholesaler and the second the retailer. This chain conspiracy is not unlike other multi-level schemes that have been found to constitute a single conspiracy. See United States v. Agueci, 310 F.2d 817, 826 (2d Cir.), cert. denied, 372 U.S. 959, 83 S.Ct. 1013, 10 L.Ed.2d 11 (1963) (chain narcotics distribution conspiracy extends several levels from importation through selling of drugs to user). This would be a different case if the government attempted to charge retailers, i.e., other spokes, other than Bumgardner, Hines, and Eleazar. Here, however, the evidence clearly shows that those three were part of a single retail operation.
 
 
 39
 The government proved at most two conspiracies, separate wholesale and retail conspiracies.[4] Nevertheless, proof of those two separate conspiracies would not have prejudiced appellants under Coward since the jury would not have been confused into imputing guilt to members of one conspiracy because of the illegal activities of the other conspiracy. With only two conspiracies, each at a distinct level, and simple in operation, the jury was not likely to confuse evidence concerning one level as being relevant concerning the other. Cf. Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946) (proof of separate conspiracies with numerous defendants where conspiracies complex amounts to prejudice).
 
 VII.
 
 40
 Agent Johannesen testified at trial against Jackson. His trial testimony accurately reflected the dollar amount and quantity of a certain transaction involving Jackson. Before the grand jury, Johannesen had overstated the dollar amounts and quantity. In order to impeach Johannesen's testimony, Jackson's attorney sought to introduce the entire written grand jury testimony of Johannesen. When Coddington's counsel objected to the introduction of the entire written testimony on the grounds of irrelevancy, the district court limited Jackson's attorney to introducing the inconsistent statements by having Johannesen read to the jury his prior inconsistent statements. Jackson now argues that the limitation was error and the written transcript should have been submitted to the jury. The argument is frivolous. The district court did not abuse its discretion. The jury was made aware of the prior inconsistent testimony and protected from other irrelevant (and perhaps prejudicial) evidence in Johannesen's grand jury testimony.
 
 VIII.
 
 41
 Eleazar and Hines argue that the evidence is insufficient to support their convictions. Viewing the evidence in the light most favorable to the government, however, the evidence is sufficient to support both convictions.
 
 
 42
 Most of Jackson's calls were made to Eleazar's telephone in Florida. During one call, Eleazar indicated that a cocaine delivery involving Hines had been accomplished. Later during that conversation, Bumgardner informed Jackson that Eleazar "went by and picked it up," the "it" meaning "cocaine." In another conversation, Eleazar told Jackson, "Bumgardner needs to talk to you," whereupon Jackson and Bumgardner proceeded to discuss a cocaine deal. Eleazar also sent money to Jackson, under instructions to use a false name, and evidence indicated that the money was in payment for drugs. Although Eleazar offered her own version of events, the jury apparently did not accept her story, and viewing the evidence favorably toward the government, her conviction must stand.[5]
 
 
 43
 Ronald Hines claims a lack of proof as to his identity as a participant in the conspiracy because he was not identified pursuant to Fed.R.Evid. 901(b)(6). That rule allows "[b]y way of illustration only" identification of a telephone caller by evidence that the call was made to a number assigned to him. Hines claims that the proof of his identity was inadequate because "the called party only identified himself as 'Ronnie'. The number ... is not subscribed to by a Ronnie." Hines also points out that there is no proof that he was at the residence at the time of the call. Nor was the recorded voice identified as his. His argument is completely without merit.
 
 
 44
 Not only did the conversant identify himself as "Ronnie," but the phone was registered in the name of his parents and Hines was at the house when a DEA investigator visited the house. That evidence is sufficient to establish Hines's identity as the conversant.
 
 IX.
 
 45
 One day during the trial, an FBI agent photographed persons leaving the courthouse and was noticed by juror Denton. Juror Denton advised the court and was informed that the photographs were not being made of jurors, that there was no cause for concern, and that the matter should be disregarded. At a post-trial hearing on the possible prejudicial influence of the picture-taking episode, juror Denton indicated that after receiving the court's assurances, he was not concerned about the photographing and the incident did not affect his deliberations. Nor was the incident further discussed by him or the other jurors after he conveyed the court's assurances to the other jurors. The district court considered Denton's testimony credible and found that the episode had no prejudicial influence on the jury. That finding is not clearly erroneous. Under Smith v. Phillips, 455 U.S. 209, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982), and Remmer v. United States, 350 U.S. 377, 76 S.Ct. 425, 100 L.Ed. 435 (1956), appellants were entitled to a hearing, which they received, on the possible prejudicial impact of the episode. Absent a showing that the district court's finding of no unfair prejudice was clearly erroneous, we cannot reverse.
 
 X.
 
 46
 For the foregoing reasons, the convictions are
 
 
 47
 AFFIRMED.
 
 
 
 [1]
 18 U.S.C. Sec. 2511(2)(c) provides:
 It shall not be unlawful under this chapter for a person acting under color of law to intercept a wire or oral communication, where such person is a party to the communication or one of the parties to the communication has given prior consent to such interception.
 Fla.Stat. 934.03(2)(c) provides:
 It is lawful under this chapter for a law enforcement officer or a person acting under the direction of a law enforcement officer to intercept a wire or oral communication when such person is a party to the communication or one of the parties to the communication has given prior consent to such interception and the purpose of such interception is to obtain evidence of a criminal act.
 
 
 [2]
 It is unnecessary to decide the government's claim that the Jacksonville monitoring was valid because Dorn and Maxwell were "special deputies" in Jacksonville. Fla.Stat. Sec. 30.09(4)(b) permits special deputies to conduct investigative work. The district court did not decide the question, but simply stated that "the officers may have had special deputy status [within Jacksonville] and, if so, the Jacksonville calls would have been within their jurisdiction."
 We also do not reach the government's argument that the appellants have no standing since none of them had possession or privacy interests in the consensually monitored telephone calls and none of the conversations involved any of the appellants; i.e., they were neither victims nor targets of the consensually monitored calls. See 18 U.S.C. Sec. 2510(11); Alderman v. United States, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969). The district court did not address the argument and it is not clear whether it was raised below.
 
 
 [3]
 Thus, the trial court instructed the jury that whether cocaine is a narcotic is
 not material to the guilt or innocence of any of the defendants in the charges as contained in the Bill of Indictment. Therefore, it is not necessary for the government to prove that the substance referred to in the indictment was a narcotic.
 I instruct you that cocaine is a Schedule II controlled substance. It is a violation of the laws of the United States for two or more persons to conspire or join together in an agreement to commit an offense in violation of the laws of the United States relating to cocaine.
 
 
 [4]
 That view of the evidence requires disregarding the substantial evidence that Jackson linked the two levels
 
 
 [5]
 The verdict of not guilty on the use of the telephone count is not inconsistent because the jury could have convicted her on the conspiracy count for picking up the drugs, and sending the money, which did not involve her use of the telephones