952 F.2d 397
 34 Fed. R. Evid. Serv. 741
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
William James FISH, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Alfatir Yasin CONNOR, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Christopher Lyman HUGHES, Defendant-Appellant.
 Nos. 91-5386, 91-5389 and 91-5397.
 United States Court of Appeals, Fourth Circuit.
 Argued Oct. 28, 1991.
Decided Dec. 16, 1991.
 
 Appeals from the United States District Court for the Middle District of North Carolina, at Greensboro. (CR-90-92-G), Norwood Carlton Tilley, Jr., District Judge.
 Argued: James Wilson Swindell, High Point, N.C., for appellant Fish; Lawrence Jay Fine, Winston-Salem, N.C., for appellant Connor; Susan Hayes, Greensboro, N.C. for appellant Hughes. Richard S. Glaser, Jr., Assistant United States Attorney, Greensboro, N.C., for appellee.
 On Brief: Anne Rebecca Littlejohn, Greensboro, N.C., for appellant Hughes; Robert H. Edmunds, Jr., United States Attorney, Greensboro, N.C., for appellee.
 M.D.N.C.
 AFFIRMED.
 Before PHILLIPS and HAMILTON, Circuit Judges, and GERALD W. HEANEY, Senior Circuit Judge of the United States Court of Appeals for the Eighth Circuit, sitting by designation.
 OPINION
 HAMILTON, Circuit Judge:
 
 
 1
 William Fish, Alfatir Connor, and Christopher Hughes appeal their convictions for conspiracy to possess with intent to distribute and to distribute quantities of crack cocaine, and for possession of crack cocaine with intent to distribute. 21 U.S.C. §§ 841, 846. Seven issues are raised on appeal. Fish challenges the admission of certain evidence pursuant to Fed.R.Evid. 404(b), the sufficiency of the evidence as to his participation in the conspiracy, and the attribution of drugs to him for purposes of sentencing. Connor argues that drug evidence obtained in the course of a stop and frisk should be suppressed because the stop and frisk violated the fourth amendment guarantee against unreasonable searches and seizures. Finally, Hughes challenges the attribution of drugs for sentencing purposes, a two point enhancement of his base offense level for possession of a firearm during a drug offense, and an enhancement in sentencing for being a supervisor or manager in the drug conspiracy. Finding no error, we affirm the judgments of the district court.
 
 
 2
 * In mid-July 1989, the defendant Christopher Hughes and Henry Clayton Bell joined together to distribute crack cocaine at "The Hill" area in Greensboro, North Carolina. Hughes would provide crack to Bell, who would sell the crack while Hughes remained in the area. This business relationship continued until September 26, 1989, when Bell was arrested by the Greensboro police. During the course of the relationship, Bell sold crack for Hughes, at Hughes direction, three to four days a week, with twenty-five to fifty "rocks" of crack valued at $20.00 apiece being sold on any given day.
 
 
 3
 On September 26, 1989, Bell came to Hughes' apartment to pick up crack for distribution as previously instructed by Hughes. Bell received three packages containing 66.1 grams of crack from Hughes in the kitchen of Hughes' apartment. Soon after Bell received the crack, an individual named "Psych," later identified as Carrington Harrell, appeared at Hughes' apartment. Hughes, his wife, Harrell, and Bell then proceeded to The Hill so that Bell could sell the crack.
 
 
 4
 Shortly after his arrival on The Hill, Bell was arrested and the police discovered the crack he possessed. Bell gave a statement to the police implicating Hughes. Based on that statement, the police obtained a warrant and searched Hughes' apartment. They found a gun and trace amounts of cocaine in the kitchen of the apartment where Hughes had given Bell crack earlier that day. At trial, Bell identified the gun as a gun Hughes had purchased on The Hill approximately three weeks prior to Bell's arrest in exchange for a quantity of crack cocaine.
 
 
 5
 Bell's involvement was limited to selling for Hughes. Harrell and Hughes, however, were involved in a larger distribution network linking Linden, New Jersey, and Greensboro, North Carolina. In August 1989, Harrell and defendant Alfatir Connor recruited Stanley Bullock for the purpose of transporting crack from Linden, New Jersey, and selling it in Greensboro, North Carolina. Hughes transported a large quantity of crack cocaine concealed in the door panels of a car from Linden to Greensboro. A second car followed with other individuals from the Linden area, including Harrell, Eric Pittman, Luquam Jones, Fred Durham, and Bullock.[1]
 
 
 6
 Defendant William Fish was with Bullock at the time Bullock observed Hughes and others placing crack cocaine in the car for transporting to North Carolina in August 1989. Bullock discussed the sale of crack in Greensboro with Fish and asked if Fish wished to join him and the others in travelling to Greensboro and selling drugs. Bullock, Jones, and Fish had previously sold drugs together in the Linden area. Fish declined to go to Greensboro on this occasion, although he later accompanied Jones and Bullock to Greensboro on December 17, 1989, for the purpose of selling drugs.
 
 
 7
 In Greensboro, the conspirators, other than Fish, divided the drugs carried by Hughes and sold them. The conspirators performed various tasks, including selling, collecting money, and watching for police. Defendant Connor was also present with the other conspirators during this particular episode of drug selling in Greensboro. Hughes boasted to Fred Durham of being "top dog," along with Carrington Harrell, in a major crack cocaine drug conspiracy between Linden, New Jersey, and Greensboro, North Carolina.
 
 
 8
 Bullock conducted a second, one-day, drug expedition in November 1989, from Linden to Greensboro. He sold approximately $1000.00 worth of cocaine for Harrell on this occasion. He was accompanied on this trip by Cory Rozier.
 
 
 9
 Defendant Connor was also in Greensboro in November 1989. On November 9, 1989, two Greensboro police officers were patrolling The Hill at approximately 10:20 P.M. in separate patrol cars. The Hill was an area specifically known as a place where drug transactions were prevalent. As the officers proceeded down High Street, the first patrol car passed a parked car which was apparently unoccupied. Immediately after the first patrol car passed, the officer in the second car, Detective Craig McMinn, saw two individuals "pop up" in unison from the front seat of the vehicle. Detective McMinn's vehicle was approximately 40 yards behind the first patrol car when this event was observed. The individuals in the parked vehicle were Connor and Rozier.
 
 
 10
 Detective McMinn pulled in behind the vehicle. The area was dark. McMinn noted that the car had no license plates, but had a paper tag in the rear window with New Jersey markings. The car was unfamiliar to McMinn, who had patrolled The Hill for some time.
 
 
 11
 After stopping the patrol car and activating his blue lights, McMinn approached the passenger side of the vehicle where Connor was seated. The officer in the first car had turned around and was approaching the driver-side passenger. Connor's hands were down between his legs as McMinn approached the car with a flashlight. McMinn spoke to Connor through the window of the car and requested that he step out of the vehicle. As Connor stepped out, McMinn saw that Connor held a large amount of cash in his hand.
 
 
 12
 After Connor exited the car, McMinn conducted a pat-down search of the defendant "for my safety and my partner's safety." McMinn testified that in the area of The Hill, he always conducted a pat-down for safety purposes.
 
 
 13
 In the course of frisking Connor, McMinn felt a hard lump in Connor's front right jacket pocket. McMinn reached in the pocket and removed the item. The lump was two plastic baggies wrapped together, one of which contained crack cocaine.
 
 
 14
 Seizure of these drugs was the subject of two suppression hearings before the district court. At the first hearing, the seized drugs and baggies were not available for examination. In addition to giving an account of the events leading to the discovery of the drugs, as set forth above, Detective McMinn testified that the lump in Connor's jacket was about the size of two cue balls placed together or perhaps somewhat smaller. He testified that the object he felt was similar in size to a small handgun. The district court concluded that under the circumstances cited, the stop and frisk leading to discovery of the drugs was proper and denied suppression.
 
 
 15
 At trial, the drugs seized by Detective McMinn were available for inspection. Counsel for the defendant requested that the district court reconsider the suppression question, because the quantity of drugs and the baggies seized from Connor could not possibly be mistaken for a weapon. Counsel argued that there was no basis for searching Connor's pocket and that the drugs should be suppressed as the fruit of an illegal search. After once again reviewing the circumstances of the stop and frisk and carefully examining the drug evidence, the district court again refused to grant the motion to suppress.
 
 
 16
 Defendant Fish came to Greensboro in December 1989 with Bullock and Jones. On December 20, 1989, Fish, Bullock, and Jones were on The Hill. The three men were observed walking together by two Greensboro police officers in a patrol car. The three initially were walking toward the patrol car in which the officers sat, but turned and began to walk away. The officers exited the car and approached the defendants, calling out "Hey you!" in order to catch the defendants' attention.
 
 
 17
 Fish, Jones, and Bullock stopped. The officers walked up, identified themselves, and attempted to speak with the defendants. Detective Robin Saul asked Fish to identify himself, but Fish's response was garbled. Saul repeated the question, but Fish's reply was again garbled. Saul concluded that Fish had something in his mouth that was impeding his speech and asked defendant to swallow before speaking. When Fish did not swallow the object, Saul asked Fish to spit the object out into his [Saul's] hand. Fish spit out a plastic bag containing 3.4 grams of cocaine. Fish was arrested at that time.
 
 
 18
 The officers also took a spray can of "Gunk" engine cleaner from defendant Jones in conjunction with this stop. The can had a false bottom. It was opened and contained 7.6 grams of crack cocaine.
 
 
 19
 Though the record is not clear, Fish was apparently released from custody following his December 20, 1989, arrest. On April 12, 1990, a federal arrest warrant was executed at defendant Fish's residence in Linden, New Jersey. The arresting officers found Fish asleep at the time. A search of the immediate area, specifically under the pillow upon which Fish slept, revealed an aspirin bottle containing 37 clear vials containing cocaine. This evidence was offered at trial by the government pursuant to Fed.R.Evid. 404(b) for the stated purpose of showing intent and knowledge with respect to the conspiracy to possess with intent to distribute and to distribute crack cocaine. Similar vials of cocaine were recovered from defendants Pittman and Connor when they were arrested that same day in New Jersey.
 
 II
 
 20
 As noted, seven issues are raised on appeal. The court addresses each issue as it pertains to each defendant below.
 
 
 21
 * Defendant Fish first argues that evidence concerning the 37 vials of cocaine seized at the time of his April 12, 1990, arrest was improperly admitted at trial and prejudiced the proceedings. The district court admitted the evidence under the "intent" exception of Fed.F.Evid. 404(b).[2] Admission of 404(b) evidence is reviewed for "abuse of discretion." United States v. Ramey, 791 F.2d 317, 323 (4th Cir.1986).
 
 
 22
 Fish's sole argument on appeal is that the district court abused its discretion in admitting the evidence because the probative value of this evidence was outweighed by its prejudicial effect. Fed.R.Evid. 403. Fish contends that the probative value of the evidence is outweighed by the prejudicial effect because the evidence was "overkill" in that there was sufficient evidence of intent already in the record, and the arrest and seizure of the vials occurred after the filing of the indictment; therefore, the cocaine discovered at the arrest was not part of the charged conspiracy.[3]
 
 
 23
 This court has upheld admission of evidence concerning postindictment "bad acts" under Fed.R.Evid. 404(b) for the purpose of showing intent, plan, scheme, or design with respect to a charged conspiracy. Ramey, 791 F.2d at 323; United States v. Hines, 717 F.2d 1481, 1489 (4th Cir.1983), cert. denied, 467 U.S. 1214 (1984); United States v. Hadaway, 681 F.2d 214 (4th Cir.1982). As the court noted in Hadaway:
 
 
 24
 [S]ubsequent conduct may be highly probative of prior intent. That one has thought in a particular illegal way over a period of time is evidence that one's thought patterns had already been so developed and were so operating on another previous occasion.
 
 
 25
 Id. at 217. To determine whether or not such evidence is admissible, the district court must exercise its discretion to "balance its probative value, defined as its relevance, necessity, and reliability, against the prejudice to the defendant of admitting the evidence." Hadaway, 681 F.2d at 217.
 
 
 26
 The indictment in the present case charged a conspiracy to possess crack cocaine with intent to distribute and to distribute crack cocaine running "to the present." The indictment was filed on March 28, 1990. Fish was arrested with the 37 vials of cocaine 15 days later on April 12, 1990. The narrow time gap between this act of possession of cocaine in a distributable form and the charged conspiracy does not render the evidence irrelevant. Cf. Hines, 717 F.2d at 1489 (subsequent delivery "several weeks" after counts alleged in indictment relevant to show intent); Hadaway, 681 F.2d at 217-18 (subsequent act 18 months after charged crimes relevant). The probative value of the post-indictment act is further enhanced because Fish was charged with conspiring to possess crack cocaine with intent to distribute and to distribute crack cocaine. He was subsequently arrested with cocaine divided into vials for individual distribution.
 
 
 27
 The relevance of the 37 vials to intent to conspire, as charged in the indictment, is lessened by the fact that defendant was arrested alone. He was not arrested in the presence of other conspirators. Two conspirators, Pittman and Jones, were also arrested that day at different locations. They, too, possessed cocaine in vials at the time of their arrest. There was no evidence specifically tying the cocaine seized on April 12 back to the conspiracy, however. There was no evidence as to the source of the April 12 cocaine or that such cocaine was destined for North Carolina.
 
 
 28
 Fish also questions the necessity of the evidence.[4] As set forth in Part II, section B, infra., there was sufficient evidence in the record from which the jury could find that Fish possessed the requisite intent to join the conspiracy alleged in the indictment without resorting to the evidence of cocaine seized on April 12. The necessity of introducing the evidence was not great, and hence the probative value of the evidence was diminished.
 
 
 29
 Examining the prejudice to defendant, the evidence was prejudicial in the sense that all relevant evidence increases the likelihood of conviction. Fed.R.Evid. 403 only protects against "unfair" prejudice which substantially outweighs the probative value of the proffered evidence. In this case, the evidence came in during the government's case in chief, but was the last evidence offered by the government at trial. No issue, except intent to join the conspiracy, was truly contested with respect to Fish.[5] Since the focus was on Fish's intent to join the drug conspiracy, this was not a case where admission of the other crimes evidence to establish intent could have persuaded the jury to convict defendant despite a paucity of evidence with respect to other elements of the charged conspiracy. See Hadaway, 681 F.2d at 219 (where elements of the crime other than intent are in doubt, admission of other crimes evidence to show intent may be highly prejudicial). Furthermore, the district court gave extensive cautionary instructions, as requested by Fish, at the time the evidence was introduced and in the charge to the jury. Defendant did not object to the content of these instructions at any time. The instruction offered by the district court specifically limited the use of the evidence of the 37 vials recovered from Fish to the question of his intent and limited the use of the evidence solely to this one defendant. Such a limiting instruction, designed to prevent misuse of the evidence by the jury, substantially dissipated any prejudicial impact of the evidence. Hadaway, 681 F.2d at 219; United States v. Rawle, 845 F.2d 1244, 1248 (4th Cir.1988).
 
 
 30
 A review of the record shows that the district court gave careful consideration to the admission of the contested evidence against Fish. The court gave extensive cautionary instructions to limit any prejudicial impact. While it may be possible to weigh the evidence differently, emphasizing the dissimilarities between the April 12 act and the charged conspiracy, and highlighting the prejudice to defendant, we cannot conclude "that the trial court acted 'arbitrarily' or 'irrationally' in admitting evidence," therefore, the district court did not abuse its discretion. United States v. Simpson, 910 F.2d 154, 157 (4th Cir.1990).
 
 
 31
 To the extent, however, that the admission of the evidence of cocaine seized on April 12 was error on the part of the district court, such error was harmless beyond all reasonable doubt. "[A]ny error in admission or exclusion is subject to the harmless error test: 'whether it is probable that the error could have affected the verdict reached by the particular jury in the particular circumstances of the trial.' " United States v. Morison, 844 F.2d 1057, 1078 (4th Cir.), cert. denied, 488 U.S. 908 (1988) (quoting United States v. Davis, 657 F.2d 637, 640 (4th Cir.1981)).
 
 
 32
 The "other crimes" evidence "did not create the impression that appellant was an ogre who should be sent to jail, guilty or not." Hadaway, 681 F.2d at 219. The evidence of the existence of the conspiracy, Fish's knowledge of the conspiracy, and his knowing participation in the conspiracy was substantial. We conclude that it is not probable that the admission of the other crimes evidence in this case affected the verdict reached by the jury in the particular circumstances of this trial. Morison, 844 F.2d at 1078.
 
 B
 
 33
 Fish next challenges the sufficiency of the evidence to sustain his conviction on the conspiracy count. Where sufficiency of the evidence is challenged, the verdict must be upheld on review, "if there is substantial evidence, taking the view most favorable to the Government to support it." Glasser v. United States, 315 U.S. 60, 80 (1942); United States v. Pelton, 835 F.2d 1067, 1074 (4th Cir.), cert. denied, 486 U.S. 1010 (1987).
 
 
 34
 In his arguments to the court, Fish does not challenge the existence of a conspiracy, his acquaintance with its members, or the solicitation of his participation. Nonetheless, defendant argues that he did not voluntarily join the conspiracy, but only possessed crack on the discrete occasion of his initial arrest on December 20, 1989, in Greensboro.
 
 
 35
 There is substantial evidence that Fish purposefully joined the conspiracy. Fish was familiar with the individuals and the methods utilized in the drug trafficking from New Jersey to Greensboro. He was specifically apprised by Bullock of the means used to transport the drugs and some of the individuals involved. Fish had previously dealt drugs with Bullock and Jones, the members of the conspiracy with whom he was arrested on December 20, 1989. It was Bullock who had apprised Fish of the conspiracy and initially attempted to recruit Fish into the conspiracy. Though he initially refused to participate in the Greensboro operation, Fish later joined the conspirators in going to Greensboro and was arrested in Greensboro, with crack, in the company of Bullock, his recruiter, and Jones, members of the conspiracy. Jones also possessed crack for distribution at the time Fish was arrested. Taken in the light most favorable to the government, there is more than sufficient evidence from which the jury could conclude that Fish willingly joined in the conspiracy.
 
 C
 
 36
 Fish also challenges the attribution of drugs seized from Jones at the same time and place as those seized from Fish in determining the applicable sentence under the sentencing guidelines. At the time of his arrest on December 20, 1989, Fish had 3.4 grams of crack in his mouth. Jones, who was arrested with Fish, had 7.6 grams of crack concealed in a "Gunk" can under his coat. Fish's sentence was calculated based on 11 grams of crack.
 
 
 37
 The district court's finding is reviewed under a "clearly erroneous" standard:
 
 
 38
 Since the base offense level in drug cases, both conspiracy and otherwise, is directly determined by the type and amount of drugs involved, the determination of the foreseeability of the extent of the overall conspiracy is often critical. This is clearly a question of fact which will only be overturned on appeal if it is clearly erroneous.
 
 
 39
 United States v. Vinson, 886 F.2d 740, 742 (4th Cir.1989), cert. denied, 110 S.Ct. 878 (1990).
 
 
 40
 In computing relevant conduct for sentencing purposes, U.S.S.G. § 1B1.3(a)(1) requires that the sentencing range be determined on the basis of "all acts and omissions ... for which defendant would be otherwise accountable...." Application Note 1 defines "otherwise accountable" as including "conduct of others ... that was reasonably foreseeable by the defendant."
 
 
 41
 The district court held that Fish could have reasonably foreseen that Jones possessed the additional 7.6 grams of crack. This finding is not clearly erroneous. It is supported by evidence in the record, including: (1) Fish was present with Jones and Bullock, his fellow arrestees, during discussions of the drug dealing in Greensboro; (2) Fish, Jones, and Bullock previously sold drugs together in Linden, New Jersey; (3) Fish, Jones, and Bullock travelled together from New Jersey to Greensboro; (4) At the time of their arrest and the seizure of Fish's and Jones' crack, the three were on The Hill, an area specifically recognized as a place where illegal drugs are bought and sold.
 
 D
 
 42
 Connor argues that his fourth amendment right against unreasonable searches and seizures was violated when police officers stopped and frisked him and discovered crack in his coat pocket at the time of his arrest on November 9, 1989. Connor's motion to suppress the crack was denied twice by the district court.
 
 
 43
 Defendant's argument on appeal has three prongs: (1) there was no articulable suspicion of particularized criminal activity to justify the initial stop of defendant; (2) there was no reasonable suspicion that defendant was armed at the time he was stopped, therefore, the frisk of defendant was improper; and (3) even if the frisk was proper, no reasonable officer could have believed that the crack was a weapon when patting down the defendant.
 
 
 44
 "Reasonable suspicion" is required to justify the stop in this case. United States v. Sokolow, 109 S.Ct. 1581, 1585 (1989). This is more than an "inchoate and unparticularized suspicion or 'hunch'." Id. (quoting Terry v. Ohio, 392 U.S. 1, 27 (1968)). Nonetheless, "[T]he level of suspicion required for a Terry stop is ... less demanding than that for probable cause." Sokolow, 109 S.Ct. at 1585. The existence of reasonable suspicion is evaluated under a "totality of the circumstances" test. Id.
 
 
 45
 Underlying factual determinations concerning the nature of the encounter are reviewed under the "clearly erroneous" standard. United States v. Porter, 738 F.2d 622, 625 (4th Cir.) (en banc), cert. denied, 469 U.S. 983 (1984). The legal determination of the existence of reasonable suspicion is reviewed de novo. Cf. United States v. Miller, 925 F.2d 695, 698 (4th Cir.), cert. denied, 112 S.Ct. 111 (1991) (determination of probable cause).
 
 
 46
 The factual events surrounding Connor's arrest are virtually undisputed. Only their legal import is challenged. The evidence showed: (1) the car in which Connor was sitting was parked on The Hill, an area known for drug activity; (2) the car initially appeared vacant when the first officer's car passed, but then Connor and the driver "popped up" in unison from the front seat of the vehicle, which was observed by the officer in the second car; (3) the arresting officer testified that he had worked The Hill for a number of years, was generally familiar with the vehicles belonging to residents of the area, and this vehicle was unfamiliar; (4) the car did not have regular license plates, only a paper tag in the window with New Jersey markings; (5) it was late in the evening and dark in the vicinity of Connor's car; (6) when approaching the vehicle to speak with Connor, the officer noticed that Connor was holding something [later determined to be cash] between his legs.
 
 
 47
 At both suppression hearings, the district court concluded that the confluence of these facts provided reasonable suspicion justifying the stop of Connor. Given the totality of these circumstances, the district court's conclusion was proper. The location of the stop in a known drug neighborhood, the lateness of the hour, and the apparent attempt, in unison, to avoid detection, when taken together, provide reasonable suspicion of criminal activity.
 
 
 48
 Connor's second contention is that there was insufficient reason to conduct the frisk, regardless of the propriety of the stop. "So long as the officer is entitled to make a forcible stop, and has reason to believe that the suspect is armed and dangerous, he may conduct a weapons search limited in scope to this particular purpose." Adams v. Williams, 407 U.S. 143, 146 (1972); Ybarra v. Illinois, 444 U.S. 85, 92-93 (1979). In Adams, the court upheld a frisk search where the officer received a tip that the suspect possessed a weapon, the officer was alone in a high crime area, and the suspect did not conform specifically to the officer's instructions incident to the stop. In Ybarra, the defendant, a customer in a bar, was frisk-searched while the police were executing a warrant to search the bar and a bartender. Drugs were found on the defendant. The court found the search improper where the police justified the Terry search solely on the fact that the defendant was present in the bar at the time the search warrant was executed. The lighting in the bar was sufficient, Ybarra was not recognized as a dangerous individual by the officers on the scene, defendant's hands were empty, and defendant made no gestures indicative of an assault. Ybarra, 444 U.S. at 93.
 
 
 49
 Connor argues that the arresting officer had no reasonable basis for believing that Connor was armed and dangerous at the time of the frisk. Appellant points particularly to a statement of the officer as follows:
 
 
 50
 Q And in your search of him [Connor], would it be accurate to say what you did was conduct a generalized cursory search for weapons?
 
 
 51
 A I would call it that, yes, sir.
 
 
 52
 (JA 43-N). Standing alone, this statement might indicate that the officer had no basis for conducting the search. As the government points out, however, this statement was made after the officer gave a detailed recitation of the circumstances surrounding the stop and subsequent search of the defendant as set forth above.
 
 
 53
 Though the question is close, we conclude that the district court was correct in finding the Terry frisk proper. As already noted, the stop and frisk occurred in a high crime area, after dark, with poor lighting. Connor and the driver appeared to be avoiding detection. As the officer approached the vehicle, Connor appeared to be hiding something between his legs.
 
 
 54
 No one of the facts relied on by the government, standing alone, would be sufficient to justify the frisk. Cf. Maryland v. Buie, 110 S.Ct. 1093, 1098 n. 2 (1990) (fact that stop and frisk occurred in high crime area, standing alone, insufficient to justify frisk). Taken together, however, each of the circumstances to which the officer testified would lead a reasonable officer to conclude that a defendant, such as Connor, was potentially armed and dangerous.
 
 
 55
 Finally, Connor argues that the officer's search was pretextual in that no reasonable officer could have concluded from patting down the exterior of defendant's coat that the package of crack was a weapon. Connor argues that the officer gave conflicting testimony as to the size of the package, which suggests a pretext.
 
 
 56
 Examination of the officer's statements regarding the size of the package shows little, if any, inconsistency. The officer stated that the object he felt was about the size of "a couple of cue balls ... maybe not quite that large." He testified that a bulge of this size would be consistent with the presence of a small caliber pistol often associated with drug dealing.
 
 
 57
 The district court specifically examined the confiscated drugs and asked the officer to fold the drugs and their packaging into the shape they were in the night they were taken from Connor's pocket. Upon examining the evidence in this fashion, the district court concluded that the bulge created by the drugs would probably be only the size of one, not two, cue balls, but nonetheless, the bulge created could reasonably approximate the size and shape of a small handgun. The district court concluded, therefore, that the officer had reasonable cause to believe that a weapon was present. The district court was not in error in finding that the drugs in Connor's pocket could have felt like a weapon to the arresting officer.
 
 E
 
 58
 Hughes argues that the sentence imposed upon him was disproportionately long relative to the sentences of the other conspirators, who Hughes claims were equally culpable. Hughes contends a downward departure was warranted to correct the disparity in sentencing which Hughes argues resulted because other defendants did not have drugs sold or possessed by third parties attributed to them at sentencing as Bell's drugs were attributed to him.
 
 
 59
 Factual determinations as to the amount of drugs attributed to a conspirator are reviewable only for clear error. United States v. Campbell, 935 F.2d 39, 46 (4th Cir.), cert. denied, 112 S.Ct. 348 (1991). A total of 361.1 grams of crack were attributed to Hughes from four sources: (1) 66.1 grams seized when Henry Bell, Hughes' seller, was arrested; (2) 180 grams from other Bell transactions; (3) 75 grams Hughes admitted transporting to Greensboro; and (4) 40 grams Hughes admitted personally selling. Hughes does not challenge the quantity of drugs sold or possessed by Bell or himself. The amounts determined by the district court were admittedly proper.
 
 
 60
 In reviewing the proportionality of the sentences imposed upon the various conspirators, the district court concluded that if the amounts attributed to Hughes were factually correct, which Hughes admitted, he was not entitled to a downward departure in sentencing simply because other conspirators' sentences were not allegedly calculated in a proper manner. The district court's conclusion is correct. "A sentencing court simply 'is not obliged to consider the sentences of codefendants.' " United States v. Foutz, 865 F.2d 617, 621 (4th Cir.1989) ( quoting United States v. Lauga, 762 F.2d 1288, 1291 (5th Cir.1985)); United States v. Porter, 909 F.2d 789, 794 n. 5 (4th Cir.1990). Cf. United States v. McKenley, 895 F.2d 184, 187-88 (4th Cir.1990) (upward departure for sole purpose of equalizing sentences of codefendants improper); United States v. Daly, 883 F.2d 313 (4th Cir.1989), cert. denied, 110 S.Ct. 2622 (1990) (no absolute duty to grant a downward departure to equalize sentences where record supports sentence imposed). The district court carefully considered the sentence of Hughes, concluded it was properly calculated, considered its discretion to depart downward, and declined to exercise that discretion, assuming it possessed such discretion. Nothing in the record suggests that the district court abused its discretion in reaching that conclusion.
 
 F
 
 61
 Hughes also challenges a two level enhancement pursuant to U.S.S.G. § 2D1.1(b) for possession of a firearm during commission of a drug offense.
 
 
 62
 Bell testified that, at Hughes' direction, he received drugs for distribution from Hughes in his kitchen on September 26, 1989. After Bell was arrested that same day and implicated Hughes in the distribution of crack cocaine, a search of Hughes' apartment revealed a gun in a drawer in his kitchen where crack was delivered to Bell earlier that day. Trace amounts of cocaine were also found in the kitchen on various objects during the search. Bell testified that the gun found in the kitchen was the same gun which Hughes had obtained on The Hill in exchange for crack cocaine approximately three weeks before Bell's arrest. This evidence supports the district court's conclusion that Hughes possessed a firearm during the commission of drug offenses. Such conclusion is not clearly erroneous. United States v. White, 875 F.2d 427 (4th Cir.1989). There was no need to prove that Hughes brandished the gun in front of Bell during the September 26, 1989, transaction in order to apply the enhancement. See United States v. Johnson, 943 F.2d 383, 386 (4th Cir.1991).
 
 
 63
 The fact that defendant was acquitted of the substantive firearms charge in the indictment does not preclude enhancement under U.S.S.G. § 2D1.1(b). See United States v. Morgan, 942 F.2d 243, 246 (4th Cir.1991); White, 875 F.2d at 433.
 
 G
 
 64
 Hughes finally challenges the district court's enhancement of his base offense level pursuant to U.S.S.G. § 3B1.1(b) based on his role as a manager or supervisor in the drug conspiracy. This guideline provides:
 
 
 65
 Based on the defendant's role in the offense, increase the offense level as follows:
 
 
 66
 ....
 
 
 67
 (b) If the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by 3 levels.
 
 
 68
 U.S.S.G. § 3B1.1(b). The district court's factual determination of a participant's role is reviewed for clear error. United States v. Sheffer, 896 F.2d 842 (4th Cir.), cert. denied, 111 S.Ct. 112 (1990).
 
 
 69
 Hughes acknowledges that Bell sold crack for him. Nonetheless, Hughes argues that his role in the conspiracy was no different than the role occupied by any other member of the conspiracy. He contends that there is insufficient evidence to support the enhancement.
 
 
 70
 Hughes supervised Bell's sales of crack. He advised Bell when and where to pick up crack cocaine for distribution, supplied Bell with crack cocaine to sell, collected drug proceeds from Bell, drove Bell to the drug distribution point, and remained on The Hill while Bell sold drugs. See United States v. Paz, 927 F.2d 176, 180 (4th Cir.1991) (enhancement for managerial role proper where defendant controlled money, drug products, and residence where drug trafficking performed). Hughes does not dispute that the drug conspiracy involved "five or more participants." Hughes boasted of being "top dog," along with Harrell, in the North Carolina drug operation. Hughes distributed crack to other members of the conspiracy to sell. Each of these facts supports the district court's decision to enhance for managerial or supervisory role.
 
 III
 
 71
 After a thorough review of the record and the controlling authorities, the court finds no error in the convictions or sentences imposed. The judgments of the district court as to each defendant are affirmed.
 
 
 72
 AFFIRMED.
 
 
 73
 PHILLIPS, Circuit Judge, and GERALD W. HEANEY, Senior Circuit Judge of the United States Court of Appeals for the Eighth Circuit, sitting by designation, joined.
 
 
 
 [1]
 Pittman, Harrell, Jones, and Durham were named as codefendants in the conspiracy count of the indictment. Jones was also named in a count charging possession with intent to distribute crack cocaine. Bullock was charged in a separate indictment. Jones was convicted on the conspiracy and possession charges, and the convictions were upheld on appeal. United States v. Jones, No. 91-5400 (4th Cir. October 22, 1991). The record does not reveal the disposition of the charges against the other defendants
 
 
 [2]
 Fed.R.Evid. 404(b) states:
 Other crimes, wrongs, or acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.
 
 
 [3]
 The government argues that the issue was not preserved for appeal, because defendant failed to object to the introduction of the evidence. A review of all references to admission of the 404(b) evidence during the trial shows no instance in which Fish's counsel specifically objected to its introduction upon the grounds now urged on appeal. After other counsel had raised such a specific objection, Fish's counsel did state, "We merely ask the court that, if the court should decide to let [in] evidence, drugs, that my client was found with, that the court would give the jury a peremptory instruction in terms of the 404 rule." (Transcript of Trial, Joint Appendix [JA], p. 401)
 Counsel did object to the scope of the search which resulted in the seizure of the cocaine at the arrest, but otherwise, counsel only requested, and received, a detailed cautionary instruction on the use of the evidence. Presuming an objection was raised and the issue was preserved on appeal, we nonetheless conclude that the district court did not abuse its discretion in admitting the evidence or, alternatively, that admission of the evidence was harmless error.
 
 
 [4]
 The "reliability" of the evidence, as an element of probative value set forth in Hadaway, 681 F.2d at 217, is not challenged in this appeal
 
 
 [5]
 At trial, counsel for Fish did not cross examine Stanley Bullock, who testified concerning Fish's introduction to and familiarity with the conspirators and the methods by which drugs were transported to North Carolina. Fish also did not present evidence to rebut the government's proof that he was in Greensboro, with other conspirators, and possessed crack at the time he was arrested, the overt act alleged in the indictment with respect to Fish. As stated by counsel, Fish's sole contention at trial was that, "He [Fish] came down for the ride, and that's it, and got caught." (JA 268)