**UNITED STATES of America, Appellee,**

v.

**Penny PORTER, Appellant.**

**No. 82–5203.**

United States Court of Appeals, Fourth Circuit.

Argued Dec. 5, 1983.

Decided July 10, 1984.

Certiorari Denied Nov. 5, 1984. See 105 S.Ct. 389.

E. Blair Brown, Alexandria, Va., for appellant.

William G. Otis, Asst. U.S. Atty., Alexandria, Va. (Elsie L. Munsell, U.S. Atty., Alexandria, Va., on brief), for appellee.

Before WINTER, Chief Judge, RUSSELL, WIDENER, HALL, PHILLIPS, MURNAGHAN, SPROUSE, ERVIN and CHAPMAN, Circuit Judges, sitting en banc.

WIDENER, Circuit Judge:

Penny Porter appeals her conviction for possession of cocaine with intent to distribute in violation of 21 U.S.C. § 841(a)(1). Her only contention is that there was no probable cause for her arrest and that the warrantless search of her luggage was unlawful. We disagree, and affirm the judgment of conviction.

An anonymous informant, on a Saturday, February 20, 1982, telephoned the Federal Aviation Administration (FAA) police at Washington National Airport, and was referred to Detective John Dawley, a Washington, D.C., Metropolitan Police Department (MPD) detective assigned to the airport as a Special Deputy U.S. Marshall on the Drug Enforcement Administration (DEA) Task Force. Dawley had been a police detective for eleven years, had been assigned to the MPD narcotics squad, had had several weeks of narcotics-related training, and had testified more than sixty times as an expert in narcotics cases. The informant told Dawley that one Penny Porter was taking or had taken a flight to Miami from National Airport at seven or nine o'clock that night and would be returning with a quantity of cocaine. The informant described Miss Porter as a black woman between 5′ 3″ and 5′ 7″ in height, weighing between 115 and 125 pounds, having long brown hair, wearing that evening a brown leather coat and a red miniskirt outfit, and carrying a large gold-colored purse. The informant also gave other information, not detailed in the record, concerning someone other than Miss Porter. Dawley that night checked Eastern Airlines flight rosters at National Airport and noted that a "T. Porter" had left for Miami on an Eastern flight that evening. He also checked out the informant's information that did not concern Miss Porter and found it correct.

The following two days, February 21 and 22, Dawley monitored Eastern flights, observing passengers disembarking from seven or eight Eastern flights arriving from Miami. On February 22, the same informant again called Dawley and advised him that this person (Miss Porter) was to arrive sometime that afternoon. While watching passengers on Eastern flight 190 from Miami leave the plane at about 3:30 p.m., without having checked the manifest for this flight, Dawley observed a woman whose "physical description matched what I had been given" and who was wearing a brown leather coat. She was also wearing

jeans, black high-heel shoes, a dark floppy hat, and sunglasses, and was carrying a piece of carry-on luggage; the red miniskirt outfit and the gold-colored purse were not evident. This woman was one of the last passengers to leave the plane. She attracted Dawley's attention by turning and looking at him as he stood in the passenger waiting area, watching him continuously as she walked down the causeway, looking over her shoulder, walking rapidly, and appearing nervous.

Detective Dawley approached the woman after she had proceeded to the general passenger area. He displayed his government credentials and told her that he was with the DEA and was investigating narcotics traffic. He asked "if she would mind speaking with me," to which she replied that she didn't mind. He asked if she had just arrived by airplane; she said that she had. He asked where she was coming from; she answered, "Miami." He then asked for her boarding pass, which she produced and which bore the name "T. Porter." He asked her name, and she responded, "Teresa Porter."

At that point, Dawley asked Miss Porter to accompany him to the DEA office, housed in the FAA police office at the airport. Dawley, who was not in uniform and was not accompanied by other officers, did not touch her, and there is no evidence that he advised Miss Porter that he was armed (we assume he was), or exhibited a firearm, or otherwise made any show of authority. Dawley testified that Miss Porter "voluntarily accompanied me ... back to the office" and that he would have let her go had she refused to accompany him; he did not indicate to her that she was free to leave. On the way to the DEA office, Miss Porter said that she "had to go to the bathroom bad," and Dawley told her that once they arrived at the DEA office she could go to the bathroom in the company of a policewoman. Miss Porter and Dawley then walked some 500 feet through the airport concourse, down a series of steps, and through a tunnel to the FAA police office. Dawley was unable to locate a policewoman to accompany her to the bathroom, and asked the FAA desk sergeant to have a policewoman come to the office.

Miss Porter was seated near the door of the FAA office. Dawley asked her for additional identification, and she began going through her carry-on bag. Dawley asked if she would mind if he looked in the bag; she said she did not mind. Dawley put the bag on the counter, felt the sides of the bag, and looked into the bag "for any type of weapon," but he did not put his hands into the bag. The detective then asked Miss Porter to accompany him to the DEA office, approximately fifty feet beyond the front desk of the FAA office, which she did. Once inside the DEA office, Dawley asked Porter if she had brought back anything from Miami. She responded, "all I have is a little smoke [meaning marijuana], but you're not going to lock me up for that, are you?" She produced from her left rear pocket a small manila envelope containing what proved to be marijuana cigarettes. Dawley responded affirmatively to her question and placed her under arrest. Only fifteen minutes had passed since Miss Porter had stepped off the plane.

Detective Dawley advised Miss Porter of her *Miranda* rights and asked whether she understood these rights; she said that she did and expressed no desire to see a lawyer. Without a warrant, he then searched her carry-on bag. He found a gold purse; in the purse was a red miniskirt wrapped around a plastic bag containing what turned out to be cocaine, with an apparent retail value of about $60,000.00. The record is silent as to whether Miss Porter or Dawley carried the bag into the DEA office. At the time of the arrest the bag was within arm's reach of Miss Porter and between Dawley and Miss Porter, who was seated near the window. After another *Miranda* warning, Miss Porter made several inculpatory statements before indicating that she wanted to see a lawyer. Before trial, Miss Porter moved to have suppressed the cocaine that was seized, and the district court denied the motion. It

found that the detective's initial encounter with Miss Porter was proper under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), that Miss Porter went to the DEA office voluntarily, and that the warrantless search was justified as incident to the arrest for the marijuana.

A district court engages in a factual determination in resolving a dispute over the nature of an encounter between police and citizen, *see United States v. Gooding*, 695 F.2d 78, 82 (4th Cir.1982). That is to say, whether the encounter is voluntary on the part of the citizen and raises no constitutional concerns, *see Florida v. Royer*, 460 U.S. 491, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229 (1983) (plurality opinion); *United States v. Mendenhall*, 446 U.S. 544, 552, 100 S.Ct. 1870, 1876, 64 L.Ed.2d 497 (1980) (opinion of Stewart, J.); *Terry v. Ohio*, 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 1879 n. 16, 20 L.Ed.2d 889 (1968); whether a limited "seizure" has occurred under *Terry v. Ohio*, requiring a reasonable, articulable suspicion of criminal activity, *Reid v. Georgia*, 448 U.S. 438, 440, 100 S.Ct. 2752, 2753, 65 L.Ed.2d 890 (1980) (per curiam); or whether a traditional arrest, requiring probable cause, has occurred. For this rea-

son we will not disturb such a determination unless it is clearly erroneous. *United States v. Gooding*, 695 F.2d at 82.

We do not find clearly erroneous the district court's finding that Detective Dawley's initial contact with Porter in the airport passenger area was a *Terry* stop.[1] The detective had the requisite reasonable, articulable suspicion of criminal activity to so detain Miss Porter and ask for identification. An informant's tip can provide the justification for a *Terry* stop even if the informant's reliability is unknown, and certainly can do so if, as here, the information is corroborated, a matter discussed more fully below. *See United States v. Gorin*, 564 F.2d 159, 160–61 (4th Cir.1977), *cert. denied*, 434 U.S. 1080, 98 S.Ct. 1276, 55 L.Ed.2d 788 (1978).

We need not determine whether the district court's finding that Porter went voluntarily to the DEA office was clearly erroneous.[2] For the purposes of our opinion, we assume that Miss Porter was under arrest after she was identified during the lawful *Terry* stop, because even at that point the detective had probable cause for an arrest based on the informant's informa-

---

1. A majority of the Supreme Court has not decided whether mere questioning of an individual by a police official can, without more, amount to a seizure under the Fourth Amendment. *Immigration and Naturalization Service v. Delgado*, —— U.S. ——, ——, 104 S.Ct. 1758, 1761, 80 L.Ed.2d 247 (1984). Likewise, we need not determine in this case that no seizure occurred when Detective Dawley initially asked questions of Miss Porter, because he had the objective justification necessary to conduct what was at most a *Terry* stop.

2. A panel of this court has noted, "Several courts have held that agents may request, without coercion, suspects stopped in public places to accompany them to an office or other place more convenient for an investigation." *United States v. Corbin*, 662 F.2d 1066, 1070 (4th Cir.1981), *citing United States v. Chatman*, 573 F.2d 565, 567 (9th Cir.1977); *United States v. Oates*, 560 F.2d 45, 57 (2d Cir.1977). In *Corbin*, 662 F.2d at 1071 & n. 13, and in *United States v. Mendenhall*, 446 U.S. at 574–75 & n. 13, 100 S.Ct. at 1887–88 & n. 13 (White, J., dissenting), findings of consent to accompany DEA agents to an airport office were upheld even though the trial courts had found that the

agents would not in fact have permitted the detained persons to leave. Here, the detective's testimony that he would have permitted Miss Porter to leave provided a basis for the district court's finding even more substantial than that in *Corbin* and *Mendenhall*. Of course, if Miss Porter went voluntarily to the DEA office, her statement that she had some marijuana certainly provided probable cause for her arrest.

We recognize, however, that there is some force to the argument that what may have begun as a *Terry* stop and Miss Porter's voluntary accompaniment of the detective to the DEA office may well have been transformed into an arrest when the detective told Miss Porter that she could only go to the restroom in the company of a policewoman.

As the Supreme Court recently has noted, an initially consensual encounter between a police officer and a citizen can be transformed into a seizure or detention within the meaning of the Fourth Amendment, "if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Immigration and Naturalization Service v. Delgado*, —— U.S. ——, ——, 104 S.Ct. 1758, 1761, 80 L.Ed.2d 247 (1984) (citation omitted).

tion, corroborated through the detective's investigation and observation. Detective Dawley had confirmed as true every fact that the informant had supplied. The informant had said that Penny Porter was leaving or had left for Miami from National Airport on Saturday night, February 20, 1982. Dawley confirmed from the flight roster that a "T. Porter" had taken an Eastern flight to Miami out of National Airport that evening. His police experience had taught him that people generally use aliases similar to their own names, and he thus reasonably believed that "T. Porter" was the Penny Porter the informant had described. The informant had given Dawley information about another person, which Dawley also verified, working most of the night (until 4 a.m.) to do so. The informant had given a description of Miss Porter's physical characteristics and her dress, for which Dawley watched over a period of two days and which he recognized when Miss Porter walked off of Eastern flight 190 on Monday, February 22. The informant had even called back on February 22 to report that the person in question would arrive that very afternoon, which of course she did. Dawley's observations of Miss Porter as she left the plane also indicated that she was the one for whom he was searching; she was one of the last passengers to leave the plane, and she appeared nervous, walked quickly, and watched him continuously as she proceeded to the general passenger area.[3] Dawley finally confirmed from the boarding pass that the person he stopped was the "T. Porter" for whom he had been searching.

The detective at least at that point, if not before, had probable cause to arrest Miss Porter. The facts which the detective corroborated here are virtually indistinguishable from those in *Draper v. United States,* 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959). In *Draper,* the Court found that a

narcotics agent had probable cause to arrest a man whom the agent observed having particular physical characteristics, wearing particular clothing, carrying a tan zipper bag, alighting from a train which was arriving from a particular place, and walking at a fast pace, all as predicted by the informant about a man the informant said was peddling narcotics. In *Draper,* the informant had given the agent information previously which the agent had always found accurate and reliable. *Id.* at 309, 79 S.Ct. at 331. In the Supreme Court's recent expression on the use of informants to provide probable cause, the Court has declared that, while the veracity of an informant is highly relevant in determining the value of an informant's report, it is only one element of a "totality of the circumstances" approach for determining the "commonsense, practical question" whether there is probable cause. *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 2327–28, 76 L.Ed.2d 527 (1983). In *Gates* a detailed tip in an anonymous letter was corroborated to a large degree by police investigation and observation, providing probable cause for the issuance of an arrest warrant for two suspected drug traffickers. The details of the tip here, like those in *Draper* and *Gates,* were carefully corroborated by Detective Dawley's investigation and observation, and Dawley found himself in a situation identical to that of the agent in *Draper,* who the Court said "had personally verified every facet of the information given him by [the informant] except whether petitioner had accomplished his mission and had the ... heroin on his person or in his bag." *Draper v. United States,* 358 U.S. at 313, 79 S.Ct. at 333. At least at the time Miss Porter produced her boarding pass, therefore, the detective had probable cause to arrest her.

We agree with the district court, regardless of the point at which Miss Porter's

---

**3.** We recognize that these characteristics, often common in the DEA's drug courier profile, standing alone cannot provide sufficient reasonable, articulable suspicion even to justify a *Terry* stop. *Reid v. Georgia,* 448 U.S. at 440–41, 100

S.Ct. at 2753–54; *United States v. Harrison,* 667 F.2d at 1161. Here, of course, what the detective observed supplemented other information already known to him.

arrest in fact occurred, that the warrantless search of her carry-on bag in the DEA office was lawful as incident to the arrest. The defendant argues that the bag was within the exclusive control of Detective Dawley after her arrest, that there were no exigent circumstances, and therefore that a warrant was necessary for Dawley to search the bag. This argument fails for two reasons. First, the Supreme Court has specifically rejected the argument. *New York v. Belton*, 453 U.S. 454, 461–62 n. 5, 101 S.Ct. 2860, 2864–65 n. 5, 69 L.Ed.2d 768 (1981). The Court has established a "bright-line" rule, *see id.* at 463–72, 101 S.Ct. at 2865–70 (Brennan, J., dissenting), that a lawful custodial arrest justifies a contemporaneous search without a warrant of the person arrested and the immediately surrounding area, *id.* at 457, 101 S.Ct. at 2862 (citing *Chimel v. California*, 395 U.S. 752, 763, 89 S.Ct. 2034, 2040, 23 L.Ed.2d 685 (1969)); *United States v. Litman*, 739 F.2d 137 (4th Cir.1984) (en banc). Miss Porter had been lawfully arrested, and it is undisputed that the bag was within her reach.[4] The Supreme Court has rejected the suggestion that more need be litigated, in particular, the issue of whether one of the reasons supporting the search-incident-to-arrest exception is present. *New York v. Belton*, 453 U.S. at 459, 101 S.Ct. at 2863, *citing United States v. Robinson*, 414 U.S. 218, 235, 94 S.Ct. 467, 477, 38 L.Ed.2d 427 (1973). We also do not believe that the bag was within the exclusive control of Detective Dawley. Again, the bag was within reach of Miss Porter, and any evidence within it was easily accessible. A primary rationale of the search-incident-to-arrest exception to the warrant requirement is that the arrestee may attempt to conceal or to destroy evidence, *Chimel v. California*, 395 U.S. at 763, 89 S.Ct. at 2040, and we think that even if such an inquiry were necessary the

rationale of that search warrant exception is applicable in this case.

The judgment of conviction is accordingly

AFFIRMED.

MURNAGHAN, Circuit Judge, dissenting:

I cannot join the majority in concluding that the warrantless search of Porter's carry-on bag in the DEA office was lawful as incident to the arrest. Nor can I join the majority's unfortunate decision to extend *New York v. Belton*, 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981) to control a factual setting fundamentally distinct from the circumstances of that case. I therefore respectfully dissent.

While it is true that the search in *Belton* was upheld as a search incident to a lawful arrest, and not as a permissible search under the "automobile exception," 453 U.S. at 462–3, n. 5, 101 S.Ct. at 2865–6, n. 5, the Court made abundantly clear that its decision applied specifically to "a lawful custodial arrest of the occupant of an automobile." *Id.* at 460, 101 S.Ct. at 2864. The court's opinion begins with:

> When the occupant of an automobile is subjected to a lawful custodial arrest, does the constitutionally permissible scope of a search incident to his arrest include the passenger compartment of the automobile in which he was riding? That is the question at issue in the present case.

*Id.* at 455, 101 S.Ct. at 2861. The court reiterated that its opinion was designed to provide a straightforward rule for "the question of the proper scope of a search of the interior of an automobile incident to a lawful custodial arrest of its occupants." *Id.* at 459, 101 S.Ct. at 2863. And the court's holding reemphasized that its deci-

---

**4.** The fact that Miss Porter may have been arrested on the way to the DEA office and searched after she arrived there is irrelevant. We have upheld, as incident to arrest, a search of items within the reach of the arrestee even where the person had been arrested and driven

to an FBI field office 30 minutes away before being searched. *United States v. McEachern*, 675 F.2d 618, 622 (4th Cir.1982). Here, only 15 minutes passed between the time Miss Porter left the plane and the time her bag was searched.

sion related to a very particular factual setting:

> Accordingly, we hold that when a policeman has made a lawful custodial arrest of the occupant of an automobile, [footnote omitted] he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile. [footnote omitted].

*Id.* at 460, 101 S.Ct. at 2864.

But the *Belton* court also warned that its holding did "no more than determine the meaning of [*Chimel v. California*, 395 U.S. 752, 763, 89 S.Ct. 2034, 2040, 23 L.Ed.2d 685 (1969)] in this particular and problematic context. It in no way alters the fundamental principles established in the *Chimel* case regarding the basic scope of searches incident to lawful custodial arrests." 453 U.S. at 460, n. 3, 101 S.Ct. at 2864, n. 3. That *Belton* establishes an absolute but circumscribed rule permitting searches in a certain defined set of cases involving automobiles on the highway is no mandate that searches be treated in an equally absolute fashion in wholly different circumstances.

*Belton,* in short, was decided as it was not simply because the events occurred in an automobile but because automobiles generally, or, more particularly, the vehicle in that case, possessed certain characteristics leading to application of the rule enunciated.

Indeed, the critical facts explaining the outcome in *Belton* relate to the predicament of a lone police officer who had stopped on the highway an automobile, containing four occupants. The officer had pulled over the speeding automobile, legitimately arrested its four occupants on sus-

picion of possession of marijuana, and had required each to stand in a separate spot on the highway while he searched one of them. The presence of the automobile in such circumstances inherently raised concerns of exigency in light of the fact that "the opportunity to search is fleeting since a car is readily movable." *Chambers v. Maroney,* 399 U.S. 42, 51, 90 S.Ct. 1975, 1981, 26 L.Ed.2d 419 (1970). *See also Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925); *Brinegar v. United States,* 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949).

> Common sense dictates, of course, that questions involving searches of motorcars or other things readily moved cannot be treated as identical to questions arising out of searches of fixed structures like houses.

*Preston v. United States,* 376 U.S. 364, 366, 84 S.Ct. 881, 883, 11 L.Ed.2d 777 (1964).[1]

*Belton,* therefore, provides no new guidelines for a search incident to a lawful arrest in a context apart from an automobile highway stop. Instead, *Belton* merely reaffirms the fundamental principle that in many cases such warrantless searches are justified " . . . by the need to seize weapons and other things which might be used to assault an officer or effect an escape, as well as by the need to prevent the destruction of evidence of the crime—things which might easily happen where the weapon or evidence is on the accused's person or under his immediate control." *Preston v. United States, supra,* 376 U.S. at 367, 84 S.Ct. at 883; *New York v. Belton, supra,* 453 U.S. at 457–58, 101 S.Ct. at 2862–63; *Chimel v. California, supra,* 395 U.S. at 764, 89 S.Ct. at 2040. "However, warrantless searches of luggage or other property

---

**1.** *Preston* is particularly relevant here since [i]n *Cooper v. California,* 386 U.S. 58 [87 S.Ct. 788, 17 L.Ed.2d 730] (1967), [footnote omitted] the Court read *Preston* as dealing primarily with a search incident to arrest and cited that case for the proposition that the mobility of a car may make the search of a car without a warrant reasonable . . . .

*Chambers v. Maroney, supra,* 399 U.S. at 49–50, 90 S.Ct. at 1980–1981. *Cooper*'s reading of *Preston* only reinforces the point that the exigencies attendant to an automobile search are of critical importance regardless of which exception ultimately provides the basis for upholding the warrantless search.

seized at the time of an arrest cannot be justified as incident to that arrest either if the 'search is remote in time or place from the arrest,' *Preston v. United States . . . or no exigency exists." United States v. Chadwick,* 433 U.S. 1, 15, 97 S.Ct. 2476, 2485, 53 L.Ed.2d 538 (1977) (emphasis supplied).

Such principles make plain that the government's sweeping argument that a valid arrest legitimizes any and all searches of the arrestee and the surrounding area, regardless of any other circumstances, is both unfounded in law, and ill-advised. In *United States v. Robinson,* 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973), the court prefaced its opinion with a reaffirmation of the distinction between a search of an arrestee's *person,* and a search of the area within his or her control.

It is well settled that a search incident to a lawful arrest is a traditional exception to the warrant requirement of the Fourth Amendment. This general exception has historically been formulated into two distinct propositions. The first is that a search may be made of the *person* of the arrestee by virtue of the lawful arrest. The second is that a search may be made of the area within the control of the arrestee.

Examination of this Court's decisions shows that these two propositions have been treated quite differently. The validity of the search of a person incident to a lawful arrest has been regarded as settled from its first enunciation, and has remained virtually unchallenged until the present case. The validity of the second proposition, while likewise conceded in principle, has been subject to differing interpretations as to the extent of the area which may be searched.

*Id.* at 224, 94 S.Ct. at 471 (emphasis in original).

There are rational and sensible reasons for treating the search of an arrestee's "wingspan" differently from that of the arrestee himself or herself. Weapons or contraband concealed in the clothing or on the body of an arrestee remain accessible to the arrestee unless and until they are confiscated and physically removed from his or her reach. In contrast, there is an entire range of situations which might arise concerning objects arguably within an arrestee's "area of control" which would not necessarily merit identical treatment. We therefore must be guided by the lack of absolutes governing searches of an arrestee's "wingspan" outside the *Belton* highway stop context, by the requirement that all searches "be strictly circumscribed by the exigencies which justify [their] initiation," *Terry v. Ohio,* 392 U.S. 1, 26, 88 S.Ct. 1868, 1882, 20 L.Ed.2d 889 (1968); *Warden v. Hayden,* 387 U.S. 294, 310, 87 S.Ct. 1642, 1652, 18 L.Ed.2d 782 (1967), and by the facts of the instant case.

The lack of exigency here is readily apparent. Aside from law enforcement personnel, Porter was alone in the airport police station at the time of the search, not standing with companions at the side of a highway. Dawley, on the contrary, was not alone and unaided. The room in which he and Porter were in was merely one part of the airport police station, and Dawley's testimony concerning his attempts to find an escort to take Porter to the ladies' room showed that at least two other officers staffed the station at that time.

There was no possibility that the arresting officer would be endangering himself or risking the loss of evidence by deferring a search of the bag until a warrant had been obtained. They were already at the police station, so no transportation or lapse of time was necessary to get Porter and the bag to a place of security. Dawley harbored no fear of weapons hidden in the bag; he himself had previously checked the bag specifically for weapons and had satisfied himself that it contained none, and he testified at the suppression hearing that he

sought only cocaine when he searched the bag a second time.[2]

The foregoing arguments demonstrate that no exigency was created by the possibility that weapons were present. Nor may the search here be justified by the exigency created by the need to protect evidence or contraband from destruction. Although conceivably such a concern may have been the motivation behind Dawley's search,[3] the requirement that the search be confined to the arrestee's "wingspan" still remains in force. *Chimel v. California, supra,* 395 U.S. at 763, 89 S.Ct. at 2040. The only testimony concerning the location of the bag at the time of the search at issue was from Dawley at the suppression hearing, who testified that "[t]he defendant was seated near the window in the airport office and the bag was located between her and myself" and that Porter was "[w]ithin arm's reach" of the bag.

But Dawley's testimony is incomplete, since nowhere does he indicate when or if he returned the bag to Porter between the time of the initial search for weapons and the later post-arrest search. The district judge made no finding on the point. Given the level of detail of the remainder of Dawley's testimony, his earlier possession when he made his consensual search, and the fact that he nowhere describes asking for Porter's bag again or taking it from her, it is difficult to escape the conclusion that he was in possession of the bag for several minutes and was responsible for any placing of the bag "within arm's reach" of Porter which arguably occurred. In light of the above facts, the majority strains the meaning of *Chimel* by concluding that the fear of concealment or destruction of the

evidence can justify the search in the instant case.

With due respect, I disagree with the majority's apparent decision to eliminate or eviscerate the need for exigency to justify the search in the instant case and in others of a like nature. Such a decision flatly contradicts the long line of Supreme Court cases, including *Belton* itself, that explicitly limits nonconsensual, warrantless searches to situations where countervailing concerns of exigency are paramount. Far from jealously protecting our society's concerns for privacy, the majority adopts a course that inevitably will lead to the further erosion of such a basic right. The majority has inaugurated an ill-advised journey down the path of erosion. Instead it is proper and in accordance with precedents to hold that the search of Porter's bag took place in violation of Fourth Amendment strictures and without her consent. I therefore would reverse the ruling of the district court, and, accordingly, I must dissent.

Judge WINTER authorizes me to say that he concurs in this opinion.

---

**2.** Indeed, since Dawley apparently never bothered to carry out a search of Porter herself prior or subsequent to searching her bag, he could not have been overly concerned that Porter would either seek to injure him or to destroy evidence.

**3.** Dawley certainly was looking for cocaine since his anonymous informant had led him to believe that Porter would be transporting the

substance. He asserted at the suppression hearing that "after she was placed under arrest, the substance I was looking for was cocaine." Whether Dawley feared for its destruction is not established in the record, although it is hard to imagine how the availability of cocaine as evidence could be adversely affected by the delay the procurement of a warrant would entail, once the bag was within Dawley's control.