UNITED STATES of America,
Plaintiff–Appellee,

v.

Charles Odell PERRIN, Defendant–
Appellant.

No. 93–5702.

United States Court of Appeals,
Fourth Circuit.

Argued Sept. 30, 1994.

Decided Jan. 31, 1995.

## OPINION

ERVIN, Chief Judge:

Appellant Charles Odell Perrin was convicted under 18 U.S.C. § 922(g)(1) for possession of a firearm by a felon and under 21 U.S.C. § 841(a)(1) for being in possession with intent to distribute more than five grams of cocaine base. Perrin's 216 month sentence on the drug charge and 180 month sentence on the weapon charge are to be served concurrently. He appeals the § 922(g)(1) conviction on the grounds that his rights under the Fourth Amendment were violated by virtue of an illegal search and that the district court erred in refusing to instruct the jury on the defense of justification. Perrin claims that his § 841(a)(1) conviction should be reversed, because the police conducted an unconstitutional search of his car. We find that the officers possessed the requisite degree of suspicion to justify the *Terry* search, that Perrin was not entitled to an instruction on justification, and that Perrin's voluntary consent assured the constitutionality of the vehicular search. Accordingly, we affirm the decision of the district court in all respects.

### I.

On July 8, 1992 police investigator Werner Extine was notified by the York County, Virginia Sheriff's Department that the department had just received an anonymous phone call indicating that crack cocaine was being sold at the Yorktown Square Apartments. The caller provided very specific information. According to the caller, "Charlie Red" and Jackie Tabb were in the area of building four at the Yorktown Apartments dealing crack cocaine. Officer Extine found the story plausible—he knew both that "Charlie Red" was the street name of Charles Odell Perrin and that the Yorktown Apartments were located in a high crime area and were the scene of numerous narcotics operations. Most important, the tip was consistent with similar information that the Department had received three days earlier. On that occasion, an unidentified caller had told the police that a black male named Charles Odell and a Jamaican named Rob

**ARGUED:** Donald E. Jeffrey, III, Hill & Rainey, Petersburg, VA, for appellant. Arenda L. Wright Allen, Asst. U.S. Atty., Norfolk, VA, for appellee. **ON BRIEF:** Helen F. Fahey, U.S. Atty., Alexandria, VA, for appellee.

Before ERVIN, Chief Judge, WILKINSON, Circuit Judge, and PHILLIPS, Senior Circuit Judge.

Affirmed by published opinion. Chief Judge ERVIN wrote the opinion, in which Judge WILKINSON and Senior Judge PHILLIPS joined.

Harvey were selling drugs in the Yorktown Apartments' laundromat.

When Officer Extine received the tip about "Charlie Red," he and Officer Barry Holloway went directly to the Yorktown Apartments. As the two drove past building four, Perrin emerged from behind the building carrying a can of beer. Officer Extine recognized Perrin from a previous encounter. Although the officer was unaware of the details of Perrin's record, he "knew Perrin had a violent criminal past." Extine approached Perrin with caution and displayed his badge. The officer testified that as soon as he was within arm's reach of Perrin, he took the beer away from Perrin and proceeded to pat him down "for my own safety." Extine found a .22 caliber Jennings Bryco Arms pistol in Perrin's pocket and immediately placed Perrin under arrest.

According to Perrin, he was carrying the gun as protection because of threats made by Delano "Dee" Graves. Perrin felt that he had to carry a gun to protect himself from Graves, despite the fact that another officer had told Perrin on the morning of July 8 that Graves was in jail.

The narcotics incident that led to Perrin's arrest on § 841(a) charges took place seven months after the weapon incident. For several weeks in early 1993, Officer Patrick of the York County Sheriff's Department had been accustomed to seeing Perrin drive a certain 1992 red, two-door Chevrolet Cavalier. On February 1, however, the officer saw a different man driving the vehicle and decided to contact the car rental company that owned the Cavalier. The following day, February 2, the company advised Patrick that the vehicle, which had been leased by Perrin's girlfriend, was a week overdue.

Later that day, Officer Patrick spotted the car while on patrol and followed it. Patrick's patrol car was only fifteen feet from the Cavalier when he recognized Perrin sitting in the front passenger seat. According to Patrick, Perrin was aware of the officer's presence. When the officer was slightly over a car length away from the Cavalier, Patrick saw Perrin lean forward in the front passen-

ger seat as if to hide something underneath him. At that point, the officer decided to pull the car over.

Perrin was asked to step out of the car, and Officer Patrick contacted the rental company so that one of its employees could come pick up the car. The officer asked for and received Perrin's consent to search the car. Another officer and a trained police dog were summoned to the scene. The canine "alerted" on the floor in front of the passenger seat, drawing Officer Patrick's attention to a film canister lying beneath the seat. In the canister was an off-white, chalky material that was later discovered to be between eight and nine grams of crack cocaine with a street value of $1,000 to $2,000. After placing Perrin under arrest for possession of cocaine with intent to distribute, Officer Patrick discovered $116 and a green beeper on Perrin's person.

## II.

 Perrin challenges his § 922(g) conviction on two grounds. First, he claims that the officers did not have the requisite level of suspicion necessary to justify the *Terry* search which revealed the .22 caliber pistol in Perrin's pocket. Whether an officer has a reasonable suspicion sufficient to warrant a *Terry* stop and frisk is subject to *de novo* review, but factual findings will not be overturned unless clearly erroneous. *United States v. Porter*, 738 F.2d 622, 625 (4th Cir.) (en banc), *cert. denied*, 469 U.S. 983, 105 S.Ct. 389, 83 L.Ed.2d 323 (1984). Perrin's second argument is that the jury should have been instructed as to the justification defense, because he supposedly had only been carrying the gun to protect himself from Delano "Dee" Graves. The issue of whether the trial court erred in refusing to instruct the jury on the defense of justification raises a question of law, and we review *de novo* the district court's conclusion. *Bose Corp. v. Consumers Union of the United States, Inc.*, 466 U.S. 485, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984); *Rawl v. United States*, 778 F.2d 1009 (4th Cir.1985), *cert. denied*, 479 U.S. 814, 107 S.Ct. 67, 93 L.Ed.2d 25 (1986).

## A.

 "[T]he police can stop and briefly detain a person for investigative purposes if the

officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause." *United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581–85, 104 L.Ed.2d 1 (1989). The level of suspicion required to justify a search under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), must be based on more than an "inchoate and unparticularized suspicion or 'hunch,'" 392 U.S. at 27, 88 S.Ct. at 1883, but it need not rise to the level of probable cause to survive scrutiny under the Fourth Amendment. *Id.* at 22–24, 88 S.Ct. at 1880–81. We have held that "[a]n informant's tip can provide the justification for a *Terry* stop even if the informant's reliability is unknown, and certainly can do so if . . . the information is corroborated." *Porter*, 738 F.2d at 625. We find that the July 8, 1992 tip, as corroborated by other information that was not obtained from the July 8 caller, exhibited "sufficient indicia of reliability to provide suspicion to make the investigatory stop." *Alabama v. White*, 496 U.S. 325, 327, 110 S.Ct. 2412, 2414, 110 L.Ed.2d 301 (1990).

■ Perrin underestimates the impact that the probable cause-reasonable suspicion distinction has on our evaluation of the quantum of evidence needed to justify a *Terry* search. "Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause." *White*, 496 U.S. at 330, 110 S.Ct. at 2416; *United States v. Wilson*, 953 F.2d 116, 124 (4th Cir.1991). An anonymous tip, for instance, when combined with other known facts, may be sufficiently reliable to serve as the basis for a *Terry* search, yet not provide sufficiently detailed information to provide probable cause for the issuance of a warrant. *White*, 496 U.S. at 330, 110 S.Ct. at 2416.

Standing alone, the tip received by Officer Extine on July 8 would not have "warrant[ed] a man of reasonable caution in the belief that [a stop] was appropriate." *Id.* at 329, 110 S.Ct. at 2416. In this case, as in *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), and *White*, the anonymous tip "provides virtually nothing from which one might conclude that [the caller] is either honest or his information reliable; likewise, the [tip] gives absolutely no indication of the basis for the [caller's] predictions regarding [Perrin's] criminal activities." *White*, 496 U.S. at 329, 110 S.Ct. at 2415 (quoting *Gates*, 462 U.S. at 227, 103 S.Ct. at 2326). The tip is to be considered, however, in light of the "totality of the circumstances—the whole picture." *United States v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981). The combination of two substantially similar tips within a three day period, Officer Extine's personal familiarity with Perrin, and the reasonableness of the officer's belief that a person suspected of dealing drugs might be carrying a weapon, is enough to convince us that the *Terry* standard has been met. *See Sokolow*, 490 U.S. at 9, 109 S.Ct. at 1586 (holding that although any one of the factors known to the investigating officers may not "by itself [have provided] proof of any illegal conduct . . . we think [that] taken together they amount to reasonable suspicion").

The most critical factor in our *Terry* analysis is that within a three-day period the sheriff's department had received two detailed accounts about Perrin selling drugs at the same apartment complex. On July 5, a caller told police that Charles Odell and Rob Harvey were selling drugs in the laundromat at the Yorktown Square Apartments. Three days later, a second call indicated that Charlie Red and Jackie Tabb were allegedly dealing crack cocaine in building four of the same Yorktown Apartments. In each instance, the police had reason to suspect that the caller possessed inside information about Perrin's activities. The first caller knew Perrin well enough to refer to him by his first and middle names. The second caller not only identified Perrin by his street name, but singled out the particular building within the apartment complex where Perrin was allegedly dealing crack cocaine. The two calls were similar enough to corroborate one another, yet offered sufficiently different details—such as who Perrin's cohorts were and the precise locations within the apartment complex—to suggest that the calls were made either by two different people or by one individual who knew a substantial amount about Perrin. After receiving word of the second phone call, Officer Extine had

reason to suspect that Perrin might be engaged in criminal activity.

The fact that the officers discovered Perrin coming out from behind building four within one hour of having received the "Charlie Red" tip offers important corroboration of the anonymous call. Officer Extine received the tip from headquarters at 6:07 p.m. and arrived at the Yorktown by 7:00. The degree to which the officers' personal encounter with Perrin can be measured as corroboration of the anonymous tip is directly related to the amount of time that passed between the tip having been received and the discovery of Perrin. Had the investigating officers not arrived at the Yorktown for several hours or had they discovered Perrin in some other part of town, the officers' observations would not have provided an independent means of bolstering the informant's account.

That the Yorktown Apartments are located in a high crime area does not, in and of itself, provide the officers with sufficient indicia of reliability to justify a *Terry* search. Were we to treat the dangerousness of the neighborhood as an independent corroborating factor, we would be, in effect, holding a suspect accountable for factors wholly outside of his control. The fact that Officers Extine and Holloway knew that the Yorktown Apartments had been the scene of substantial narcotics activity is relevant, however, insofar as it helps to explain the mindset of the police officers as they approached Perrin. Officer Extine knew that drugs were sold regularly at the Yorktown, and it is certainly reasonable for an officer to believe that a person engaged in the selling of crack cocaine may be carrying a weapon for protection. Because Officer Extine knew that he was approaching a person with a violent criminal past, it was even more reasonable for him to take the precautionary measure of conducting a limited *Terry* search.

Unlike the investigating officers in *White*, Officers Extine and Holloway were able to corroborate their tip based on information that was outside the scope of the July 8 call. The officers in this case had more personal knowledge about the suspect than did the officers in *White*, who knew nothing about the woman that left building 235 in a brown Plymouth station wagon. Here, the investigating officer knew that "Charlie Red" was the street name of Charles Odell Perrin, that Perrin had a violent criminal past, that Perrin had been the subject of a similar anonymous tip three days earlier, and that the Yorktown Apartments were the scene of frequent drug activity. Most important, when Officers Extine and Holloway arrived at building four of the Yorktown, they knew for a fact that it was "Charlie Red" emerging from behind building four. We do not dismiss the possibility that the July 8 informant may have created the "Charlie Red" story out of whole cloth, simply to harass Perrin. Although such a scenario is possible, the fact that the officers possessed additional information—entirely independent from that obtained from the July 8 caller—provides a stronger foundation for the officers' suspicions.

"[T]here must be a narrowly drawn authority to permit a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual...." *Terry*, 392 U.S. at 27, 88 S.Ct. at 1883. Officer Extine specifically testified about his having conducted the search for his own safety. In light of all the information that Officer Extine possessed about Perrin and the suspected drug dealings, we refuse to challenge the officer's word and hold that Perrin was the subject of a reasonable *Terry* search.

### B.

In *United States v. Crittendon,* 883 F.2d 326 (4th Cir.1989), we adopted a four-prong test that several other circuits have also used to evaluate the merits of a defendant's justification defense. *E.g., United States v. Paolello,* 951 F.2d 537, 540–41 (3d Cir.1991); *United States v. Lemon,* 824 F.2d 763, 765 (9th Cir.1987); *United States v. Gant,* 691 F.2d 1159, 1162–63 (5th Cir.1982). The defendant must produce evidence which would allow the factfinder to conclude that he

(1) was under unlawful and present threat of death or serious bodily injury;

(2) did not recklessly place himself in a situation where he would be forced to engage in criminal conduct;

(3) had no reasonable legal alternative (to both the criminal act and the avoidance of the threatened harm); and ·

(4) a direct causal relationship between the criminal action and the avoidance of the threatened harm.

*Crittendon,* 883 F.2d at 330. *Crittendon* focused on the first prong of this test, holding that a defendant is not entitled to an instruction on the defense unless the evidence "support[s] a conclusion that he was under a present or imminent threat of death or injury." *Id.* Whether a defendant's principal motivation for carrying a firearm is genuine is not the critical inquiry, for "generalized fears will not support the defense of justification." *Id.* A defendant must show that "a real and specific threat existed *at the time of the unlawful possession.*" *Id.* (emphasis added).

In *Crittendon,* eight months prior to his eventual arrest for unlawful possession of a firearm, the defendant was shot while walking home from work. Fearing for his own safety and that of his wife, who had received several death threats over the telephone, the defendant purchased a revolver as a means of security. Although it may have been perfectly rational for the defendant to have feared another attack, we upheld the trial court's decision not to instruct the jury on the defense of justification. The defendant was not in imminent danger at the time that he was arrested on the § 922(g) charge.

It has been only on the rarest of occasions that our sister circuits have found defendants to be in the type of imminent danger that would warrant the application of a justification defense. *See United States v. Singleton,* 902 F.2d 471, 472 (6th Cir.) (noting the infrequency with which a defense of justification is appropriate), *cert. denied* 498 U.S. 872, 111 S.Ct. 196, 112 L.Ed.2d 158 (1990). A brief consideration of two such cases reveals the weakness of Perrin's position. In *United States v. Panter,* 688 F.2d 268 (5th Cir.1982),

the Fifth Circuit recognized that, in certain limited circumstances, a convicted felon would be justified in taking possession of a firearm.* Bud Lins, a convicted murderer, had been drinking heavily at the bar where the defendant, Lester Panter, worked. The two men argued with one another briefly, and then Lins stabbed Panter in the abdomen three times with a pocketknife. *Id.* at 269. It was only at this point that Panter, in reaching for a club he kept under the bar, discovered that there was also a gun lying within reach. The Fifth Circuit found that Panter had "react[ed] out of a reasonable fear for the life and safety of himself," *id.* at 272, and reversed his conviction because the illegal firearm possession occurred "in the actual, physical course of a conflict." *Id.* In *Panter,* "[a] real and specific threat existed at the time of the unlawful possession." *Crittendon,* 883 F.2d at 330.

Similarly, in *Paolello,* the defendant faced a far more immediate threat than Perrin did. Paolello had gotten into a heated argument with a man while inside a tavern and, upon exiting, realized that the man had followed him outside. The unidentified man struck Paolello's stepson in the face, then raised a gun into the air. Fearing for his stepson's safety, Paolello grabbed the man's hand and wrestled the gun away from him. The Third Circuit concluded that the threats made inside and outside the tavern, combined with the assault on Paolello's stepson and the presence of a gun at the scene, "established that [Paolello] was subject to an immediate threat of death or serious injury." *Id.* at 542.

■ The facts of the present case are light years away from the scenarios presented in *Paolello* and *Panter.* Neither *Panter* nor *Paolello* were cases in which a felon had "arm[ed] himself or herself and go[ne] looking for trouble." *Wheeler,* 800 F.2d at 107. To the contrary, the defendants were deemed to have had "no alternative—either before or during the event—to avoid violating the law." *Singleton,* 902 F.2d at 473. Like the defendant in *Crittendon,* Perrin is

---

* Panter's conviction was under 18 U.S.C.App. § 1202(a)(1), a provision virtually identical to 18 U.S.C. § 922(g)(1).

unable to demonstrate that "a real and specific threat existed at the time of the unlawful possession." *Crittendon,* 883 F.2d at 330. In fact, Perrin was never under "a present or imminent threat of death or injury." The most specific threat Perrin was able to articulate at trial was that Graves had gone to the apartment of a cousin of Perrin's with shotgun in hand, looking for Perrin two days prior to Perrin's arrest. Although Perrin's fear of an attack by Graves may have been rational, it is the same type of generalized fear we were unwilling to find worthy of a justification instruction in *Crittendon.* Nothing suggests that Graves was anywhere near the Yorktown Apartments at the time Officer Extine approached Perrin on July 8, 1992. In fact, Perrin has not identified a single instance in which he and Graves confronted one another. Graves' appearance two days prior to Perrin's arrest does not provide a sufficiently tight nexus between the perceived threat and the possession of the firearm. Consistent with other circuits, we continue to construe the justification defense for possession of a firearm by a felon very narrowly. *See, e.g., Paolello,* 951 F.2d at 541 (adopting a "restrictive" view of the justification defense); *Singleton,* 902 F.2d at 472; *United States v. Vigil,* 743 F.2d 751, 756 (10th Cir.), *cert. denied,* 469 U.S. 1090, 105 S.Ct. 600, 83 L.Ed.2d 709 (1984).

### III.

■ Perrin appeals his 21 U.S.C. § 841(a)(1) conviction for possession with intent to distribute more than five grams of cocaine base on the ground that the police search of the rental car in which he was riding was constitutionally suspect. A defendant who voluntarily consents to a search waives his Fourth Amendment rights, and the police officer may conduct the search without probable cause or a warrant. *Schneckloth v. Bustamonte,* 412 U.S. 218, 235, 93 S.Ct. 2041, 2051, 36 L.Ed.2d 854 (1973). Contrary to Perrin's assertion, *Schneckloth* does not require that the subject of a search have knowledge of his right to refuse consent. 412 U.S. at 249, 93 S.Ct. at 2059; *United States v. Wilson,* 895 F.2d 168, 172 (4th Cir.1990) ("proof of knowledge of a

right to refuse [is not] the *sine qua non* of an effective consent to a search").

■ Generally, the voluntary nature of a particular consent is a question of fact to be resolved in light of all the circumstances, *United States v. Mendenhall,* 446 U.S. 544, 557, 100 S.Ct. 1870, 1879, 64 L.Ed.2d 497 (1980), and a district court's finding in this regard is to be upheld unless clearly erroneous. *United States v. Gordon,* 895 F.2d 932, 938 (4th Cir.), *cert. denied,* 498 U.S. 846, 111 S.Ct. 131, 112 L.Ed.2d 98 (1990). In this case, however, Perrin failed to challenge the constitutionality of the search at the district court level. As a result, we review for plain error, Fed.R.Crim.P. 52(b), correcting only those errors where a miscarriage of justice would have otherwise occurred. *United States v. Young,* 470 U.S. 1, 15, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1 (1985).

■ When Officer Patrick had Perrin step out of the car, Perrin consented to a search of the vehicle. Neither the officer's testimony nor any argument made by Perrin's counsel suggests that the police used coercive tactics to gain Perrin's consent. In fact, Perrin's only challenge to the search is that he was not apprised of his right to refuse Officer Patrick's request. Under *Schneckloth,* such an attack is insufficient to undermine the constitutionality of the search. 412 U.S. at 249, 93 S.Ct. at 2059.

The district court did not commit plain error in denying Perrin's motion to suppress the fruits of the vehicular search. The crack cocaine, beeper and $126 found in the rental car were all properly admitted as fruits of a constitutionally valid search. Consequently, we affirm Perrin's conviction under 21 U.S.C. § 841(a)(1).

The judgment of the district court is

*AFFIRMED.*