**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

—————

**No. 08-4441**

—————

UNITED STATES OF AMERICA,

                    Plaintiff - Appellee,

          v.

JOHN HENRY SWAIN,

                    Defendant - Appellant.

—————

Appeal from the United States District Court for the Southern District of West Virginia, at Beckley.   Thomas E. Johnston, District Judge.  (5:07-cr-00160-01)

—————

Argued:  March 27, 2009                    Decided:  May 4, 2009

—————

Before MICHAEL and TRAXLER, Circuit Judges, and Thomas D. SCHROEDER, United States District Judge for the Middle District of North Carolina, sitting by designation.

—————

Affirmed by unpublished per curiam opinion.

—————

**ARGUED:** Matthew A. Victor, VICTOR VICTOR & HELGOE LLP, Charleston, West Virginia, for Appellant.  John Lanier File, OFFICE OF THE UNITED STATES ATTORNEY, Charleston, West Virginia, for Appellee.  **ON BRIEF:** Charles T. Miller, United States Attorney, Charleston, West Virginia, for Appellee.

—————

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

John Swain entered a conditional guilty plea to the charge of being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). He reserved the right to appeal the district court's denial of his motion to suppress the firearm, which police discovered after conducting an investigative stop and frisk. Swain argues that the stop and frisk violated his Fourth Amendment rights because the police lacked reasonable suspicion. We find Swain's argument to be without merit and affirm the district court's determination.

I.

We recount the evidence in the light most favorable to the government, which ultimately prevailed in the suppression proceedings. United States v. Seidman, 156 F.3d 542, 547 (4th Cir. 1998). On August 2, 2007, West Virginia State Police Troopers Jason Davis and R. A. Daniel went to the Beaver Street Apartment Complex (Beaver Apartments) in Beckley, West Virginia, to execute an arrest warrant for an individual named Ricky Toney. The troopers had information that Toney "had been hanging out up at those apartments." J.A. 62. The troopers approached the apartment building in a marked police car by an access road that led into a parking lot in the rear of the building. Swain and a companion were seated on a concrete step

2

of one of two rear entrances to the building. Initially, it did not appear to Trooper Davis that the individuals "were doing anything unlawful or were armed and dangerous." J.A. 194. (The record does not suggest that Trooper Davis mistook either Swain or his companion for Toney.)

When the police cruiser entered the parking lot, Swain and his companion "jump[ed] up" and attempted to enter the apartment building through the rear door behind them. J.A. 64. The rear door was locked, and although Swain and his companion "rattled the door to get it open," they could not gain entrance. J.A. 149. Both troopers got out of the cruiser, and Trooper Davis began walking toward Swain and his companion, who were approximately forty feet away.

When Trooper Davis was approximately twenty to twenty-five feet from Swain and his companion, he "hollered at the two individuals, [and] asked them their names." J.A. 65, 67. Swain turned to face Davis, stuck his hands in his jacket pockets, and asked, "What's going on? What's going on?" J.A. 65. Trooper Davis asked Swain to remove his hands from his pockets, which Swain did. But as Trooper Davis continued to approach, Swain put his left hand back into his jacket pocket. Trooper Davis said, "Hey, get your hands out of your pockets." J.A. 66. Trooper Davis then asked Swain and his companion whether they knew Ricky Toney. Swain responded, "Why? What's going on?

3

What's going on?"  J.A. 66.  Swain stuck his left hand into his jacket pocket for a third time.  Throughout this exchange, Trooper Davis noticed that Swain was "real jittery, kind of nervous," and "shaking a little bit."  J.A. 66, 112.

At that point Trooper Davis says he suspected that Swain was hiding something illegal.  Davis removed his gun from his holster and told Swain to take his hands out of his pockets and to get up against the wall.  Swain and his companion put their hands on the building.  Trooper Davis approached Swain first and conducted a pat-down during which he felt a small caliber pistol in the left pocket of Swain's jacket.  Trooper Davis called for Trooper Daniel, who, until this point, had been talking to the driver of a vehicle in the parking about Ricky Toney's possible whereabouts.  Trooper Daniel approached and took possession of the firearm.  Trooper Davis then continued the pat-down of Swain, while Trooper Daniel conducted a pat-down of the other individual.  The further pat-down of Swain yielded a small black pouch containing a substance that appeared to be cocaine.  The substance later tested negative as a controlled substance.  A subsequent search of Swain incident to his arrest yielded six rounds of ammunition.

Trooper Davis arrested Swain because he believed Swain was in possession of cocaine, an illegal controlled substance; that charge was dropped after forensic testing.  Trooper Davis

4

also contacted the dispatcher to check Swain's criminal history. Davis learned that Swain had a prior felony conviction and was thus illegally in possession of the firearm. Swain was later indicted on a felon in possession charge.

Swain filed a motion to suppress the gun that was taken from him arguing that Trooper Davis did not conduct a lawful stop and frisk under Terry v. Ohio, 392 U.S. 1 (1968). The magistrate judge recommended that the district judge grant Swain's motion. The district judge rejected that recommendation, however, and denied the motion. Swain now appeals the denial of the motion.

## II.

A police officer may lawfully stop and briefly detain an individual for investigative purposes if the officer has "reasonable suspicion supported by articulable facts that criminal activity 'may be afoot.'" United States v. Perrin, 45 F.3d 869, 871-72 (4th Cir. 1995) (quoting United States v. Sokolow, 490 U.S. 1, 7 (1989)). Moreover, if the officer has reason to believe that he is dealing with an armed and dangerous individual, the officer may lawfully frisk the individual in the course of the stop. Terry v. Ohio, 392 U.S. 1, 27 (1968); see also United States v. Burton, 228 F.3d 524, 528 (4th Cir. 2000) (authorizing protective frisk only in context of lawful Terry

5

stop).  "Whether an officer has a reasonable suspicion sufficient to warrant a Terry stop and frisk is subject to de novo review, but factual findings will not be overturned unless clearly erroneous."  Perrin, 45 F.3d at 871; see also United States v. Perkins, 363 F.3d 317, 320 (4th Cir. 2004).

Swain contends that Trooper Davis did not have "reasonable suspicion" that he was illegally in possession of a concealed weapon or narcotics.  J.A. 418.  As the district court found, the encounter between Trooper Davis and Swain escalated to a Terry stop when Trooper Davis pulled his gun and ordered Swain to move up against the wall.  United States v. Swain, No. 5:07-cr-00160, slip op. at 18 (S.D. W. Va. Dec. 3, 2007).  We consider the totality of the circumstances "to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing" at that moment.  United States v. Mayo, 361 F.3d 802, 805 (4th Cir. 2004) (internal quotations omitted).

The district court found that Swain's behavior provided Trooper Davis with reasonable, articulable suspicion that Swain possessed a controlled substance or a concealed weapon.  Swain, slip op. at 24-25.  To begin with, the district court found that the Beaver Apartments were located in a neighborhood disposed to criminal activity.  It further found that when the state troopers approached the apartment building,

6

Swain and his companion engaged in evasive behavior; they stood up quickly and attempted to enter the apartment building, rattling the door in the process. Swain appeared nervous and jittery throughout the encounter. His responses to Trooper Davis's questions -- "What's going on? What's going on?" -- further evidence Swain's nervous demeanor. J.A. 65. Finally, Swain repeatedly put his left hand in his left jacket pocket despite Trooper Davis's requests that he keep his hands out of his pockets.

### A.

Swain first argues that the district court erred in finding that the Terry stop took place in an "area [that] has a disposition to criminal activity." See Swain, slip op. at 17. We have held that a suspect's presence in a high crime area is something that a court may consider in reviewing the context in which a police officer acted, although it is not enough by itself to raise reasonable suspicion. United States v. Lender, 985 F.2d 151, 154 (4th Cir. 1993); see also Illinois v. Wardlow, 528 U.S. 119, 124 (2000); Perrin, 45 F.3d at 873. Reasonable suspicion is a context-driven inquiry and the high-crime-area factor, like most others, can be implicated to varying degrees. For example, an open-air drug market location presents a different situation than a parking lot where an occasional drug deal might occur. In the present case the district court found

7

that the Beaver Apartments parking lot is an area with a disposition toward criminal activity, "even if [it] is not a high crime area per se." Swain, slip op. at 17.

The character of a Terry stop's location is a factual question, United States v. Wright, 485 F.3d 45, 53 (1st Cir. 2007), which we review for clear error. Perrin, 45 F.3d at 871. In the present action, the district court considered evidence that Trooper Davis had personally made drug buys within two hundred yards of the Beaver Apartments and that other officers had arranged for controlled buys either at the apartment building or in the general area. Statistical data also supported a finding that the area was disposed toward criminal activity (it ranked fourteenth of seventy-five areas in the city in terms of serious crimes). Moreover, Trooper Davis was in the Beaver Apartments parking lot to execute an arrest warrant that arose out of a drug transaction in that very lot. Based on the evidence before it, the district court did not clearly err in finding that the Beaver Apartments parking lot is located in a neighborhood with a disposition toward criminal activity.

B.

Swain also challenges the district court's determination that Trooper Davis had a reasonable, articulable suspicion that criminal activity was afoot. Reasonable suspicion required Trooper Davis "to point to specific and

8

articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the] intrusion." United States v. Sprinkle, 106 F.3d 613, 617 (4th Cir. 1997) (quoting Terry, 392 U.S. at 21). "[I]n determining whether the officer acted reasonably in such circumstances, due weight must be given, not to his inchoate and unparticularized suspicion or 'hunch,' but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience." Terry v. Ohio, 392 U.S. 1, 27 (1968); see also Perrin, 45 F.3d at 872 ("The level of suspicion required to justify a search under [Terry v. Ohio], must be based on more than an inchoate and unparticularized suspicion or 'hunch.'") (internal quotations omitted).

Swain argues that United States v. Burton, 228 F.3d 524 (4th Cir. 2000), controls. In Burton we determined that police officers lacked reasonable suspicion that criminal activity was afoot when they approached an individual without any suspicion that he was engaged in criminal activity, but the individual refused to answer questions or to comply with requests that he remove his hands from his coat pockets. Id. at 528. The government notes that Burton is not on all fours: the defendant in Burton did not engage in evasive behavior or appear nervous. Nor did the defendant repeatedly remove and then

9

replace one hand into a particular pocket. Additionally, the encounter in Burton did not take place in a high crime area.

The government argues that United States v. Mayo, 361 F.3d 802 (4th Cir. 2004), is controlling. In Mayo we concluded that police officers had reasonable suspicion to stop and frisk a suspect they encountered in a high crime area who attempted to evade police. Id. at 808. Swain argues that his efforts to enter the Beaver Apartments are more susceptible to innocent explanation than the behavior of the suspect in Mayo, who upon seeing the police "turned 180 degrees" and walked into a nearby apartment complex and out the other side. Id. at 807. In any event, the suspect in Mayo was moving quickly with his hand in his pocket in a way "consistent with an individual's effort to maintain control of a weapon while moving," and there appeared to be something heavy in his pocket. Id. at 803, 807. The suspect was shaking and reacted to the police "in a peculiar manner." Id. at 804. His "eyes were extremely wide, his mouth was slightly agape, and it was almost like nothing registered with him. It was almost as if he was in shock." Id. As the district court recognized, the facts in the present appeal do not mirror the facts in either Burton or Mayo.

We conclude that, considered together, the articulable facts discussed by the district court here establish reasonable suspicion that Swain had narcotics or a firearm in his pocket.

10

First, Swain and his companion engaged in evasive behavior. Upon seeing the police cruiser, they "jump[ed] up" and attempted to enter the apartment building behind them. J.A. 64. Second, Swain did not respond directly to Trooper Davis's questions, but stuck his hands in his pockets and said, "What's going on? What's going on?" J.A. 65. Third, throughout the exchange Swain appeared "real jittery, kind of nervous" and was "shaking a little bit." J.A. 66, 112. Fourth, Swain removed his hands from his jacket pockets when asked to by Trooper Davis, but he replaced his left hand in his pocket directly thereafter. Fifth, after removing his hand from his pocket to comply with Trooper Davis' second request, Swain again put his left hand back into his left pocket. Sixth, the area was somewhat disposed to drug activity and related crimes. These facts give rise to more than unparticularized suspicion or a simple hunch that Swain was hiding a firearm or narcotics in his pocket. Taken in combination, they amount to reasonable suspicion that Swain had a firearm or narcotics in his pocket. Trooper Davis was thus permitted under the Fourth Amendment to conduct a Terry stop and frisk of Swain.

The district court's denial of Swain's motion to suppress is therefore

AFFIRMED.

11